CHARLES E. MOYLAN, Jr., Judge
 

 (retired, specially assigned).
 

 Old Marsden’s Ghost
 

 As the primary contention on this appeal intriguingly reveals, the ghost of Old Marsden, dominating central character of
 
 Wright v. Doe d. Tatham,
 
 7 Adolphus & E. 313, 112 Eng. Rep. 488 (King’s Bench, 1837),
 
 aff'd,
 
 5 Cl. & F. 559, 47 Rev. Rep. 136 (House of Lords, 1838), still rises periodically from an unquiet grave and, like old King Hamlet, is “doomed for a time to walk the night.” It was in the 1837 opinion of Baron Parke that the term of art “implied assertion” first saw the light of day.
 
 [1]
 

 John Marsden was possessed of a great country estate in Lancashire, including Hornby Castle as well as numerous
 
 *250
 
 mines, fisheries, commons, and a variety of manorial rights. The contest between Wright, Marsden’s steward and devisee, and Admiral Tatham, Marsden’s cousin and heir at law, hinged upon old Marsden’s testamentary capacity to make a will in 1822 and a codicil in 1825.
 

 Admiral Tatham challenged his cousin’s testamentary capacity by introducing evidence
 

 that Marsden was treated as a child by his own menial servants; that, in his youth, he was called, in the village where he lived, “Silly Jack,” and “Silly Marsden,” ...; that a witness had seen boys shouting after him, “There goes crazy Marsden,” and throwing dirt at him, and had persuaded a person passing by to see him home.... ”
 

 112 Eng. Rep. at 490. In response, three letters to Marsden from three separate and then deceased correspondents were offered by Wright to prove that Marsden was, in fact, competent. A letter from a cousin in America, in 1784, recounted the details of the trans-Atlantic voyage and described conditions in the former colonies. A second letter, from the local vicar, in 1786, discussed the settlement of a legal dispute between Marsden and the parish. A third letter, from a Reverend Ellershaw, in 1799, thanked Marsden for having obtained Ellershaw’s earlier appointment as a curate. The evidentiary theory of the proponent was that the tone of the letters indicated that the correspondents believed Marsden to be competent and that those beliefs by persons who knew him, in turn, proved that Marsden was competent.
 
 [2]
 

 
 *251
 
 The holding of
 
 Wright v. Tatham
 
 was that the letters were “implied assertions” of Marsden’s competency and were, therefore, inadmissible hearsay.
 
 [3]
 
 The imprimatur of the House of Lords was placed on that holding in 1838.
 
 [4]
 

 For more than a century after 1838,
 
 Wright v. Tatham
 
 assumed a generative lead role in the law of evidence comparable to that played by
 
 Palsgraf
 
 in torts, by
 
 Adams v. Lindsell
 
 in contracts, and by
 
 Shelley’s Case
 
 in the law of trusts. Both 1) non-assertive non-verbal conduct and 2) non-assertive utterances were regularly held to be hearsay as “implied assertions” when they were offered for the two-step inferential process of 1) first implying a belief on the part of the declarants and 2) then implying the truth of the things believed.
 

 It was only 34 years after the House of Lords affixed its seal of approval that the Maryland Court of Appeals also signed on to
 
 Wright v. Tatham
 
 in
 
 Waters v. Waters,
 
 35 Md. 531, 543-46 (1872), a case involving testamentary capacity. (“We yield our unqualified assent to the rule of evidence established in that case.”) Citing
 
 Waters v. Waters,
 
 the Court of Special Appeals continued to pursue the siren call in
 
 Eiland v. State,
 
 92 Md.App. 56, 79-82, 607 A.2d 42 (1992), rev’d on other grounds sub nom.
 
 Tyler v. State,
 
 330 Md. 261, 623 A.2d 648 (1993). In
 
 Eiland,
 
 to be sure, we held three challenged
 
 *252
 
 utterances to be admissible, but we did so, not on the ground that they were non-hearsay, but on the very different ground that they qualified as trustworthy under four separate exceptions to the Rule Against Hearsay.
 
 [5]
 

 Notwithstanding a massive pull-back by the Federal Rules of Evidence in 1973, and by the Maryland Rules of Evidence in 1994, from what had been deemed hearsay in the case of non-assertive non-verbal behavior and an apparent, albeit less explicit, pullback in the case of non-assertive utterances and even some assertive utterances, the law of evidence still struggles to fence off the outer boundary of the “implied assertion” as an instance of possible hearsay, and there are still randomly reported sightings of Old Marsden along the forest edges of that boundary. The most recent alleged sighting was by the appellant in this case.
 

 The Murder of Three-Year-Old Calen
 

 The appellant, Erik Stoddard, was convicted by a Baltimore City jury, presided over by Judge Roger W. Brown, of the second-degree murder of three-year-old Calen DiRubbo and of child abuse resulting in death. The appellant was the live-in boyfriend of the victim’s mother and was regularly, albeit not exclusively, the daytime caretaker of Calen.
 

 The immediate cause of death was multiple blunt force injuries. Although the time of Calen’s death was between 8:30 p.m. and 10:30 p.m. on June 15, 2002, the state of Calen’s body indicated to the medical examiner that the fatal injuries had
 
 *253
 
 been inflicted at some time between 4:00 a.m. and 6:30 p.m. that day. The onset of vomiting by Calen at about noon, which the medical examiner opined would have followed shortly after the infliction of a “tremendous amount of force” to the abdomen, resulting in a severed bowel, further pinpointed the likely timing of the injury to shortly before noon. It was at noon that the appellant called Calen’s mother to report the vomiting. Moving downward from the earliest end of the time range, the presence in the home of Calen’s mother until she went to work at 9 a.m., and the presence of Calen’s maternal grandfather until about 11 a.m., permits the inference that the ultimately fatal injuries were not inflicted before 11 a.m. Inferentially, the critical time period may well have been between 11 a.m. and noon.
 

 The medical examiner also established that there was evidence of numerous injuries on various parts of Calen’s body and that those injuries had been inflicted over a period of a month or more prior to Calen’s death. The maternal grandmother noticed, beginning in March, various bruises on Cal-en’s body, a “goose egg” on her forehead, and black eyes. She warned her daughter that if she saw any more injuries to the child, she was going to call social services. In June, she testified, Calen became extremely upset about returning home when the appellant was there.
 

 Calen’s aunt also testified that, beginning in March, Calen became more withdrawn and began to regress in her speaking skills. The aunt also noticed a large bruise on Calen’s forehead, black eyes, and a bruise on the check.
 

 Calen’s mother began noticing bruises on Calen’s body over a period of four or five months before she died. She recounted, in a statement to the police that was introduced as substantive evidence, that the appellant was toilet training Calen by spanking her so hard that it left bruises on her buttocks. The appellant ignored the mother’s admonishment that he was hitting Calen too hard. She stated that she heard Calen cry out in pain with “shrill shrieks” when Calen was
 
 *254
 
 alone in the bathroom with the appellant. She stated that the appellant once injured Calen by “whacking” her on the head.
 

 In any event, the appellant does not challenge the legal sufficiency of the evidence to support the convictions. He raises the two contentions, challenging evidentiary rulings,
 

 1. that Judge Brown erroneously admitted an out-of-court implied assertion in violation of the hearsay rule, and
 

 2. that Judge Brown erroneously permitted the State to question three separate witnesses about prior acts of violence on the part of the appellant.
 

 Ají Out-of-Court Utterance By Eighteen-Month-Old Jasmine Pritchett
 

 On June 15, Jennifer Pritchett, Calen’s aunt, dropped off her eighteen-month-old daughter, Jasmine, Calen’s cousin, to stay with Calen while she, the mother, was attending a wedding. Jasmine arrived at between 11:15 and 11:30 a.m. At home were Calen and Calen’s five-year-old brother, Nick. Attending the three children was the appellant. The timing was such that Jasmine may well have been present when the fatal injuries were inflicted on Calen. Jennifer Pritchett picked Jasmine up between 4:15 and 4:30 p.m.
 

 Jennifer Pritchett testified about dramatic changes in Jasmine’s behavior immediately following her visit to 2505 Moore Avenue on the day Calen died. She testified that, although Jasmine had never before in her life exhibited any such behavior, she suddenly began suffering nightmares, hives, unaccustomed fear of strangers or loud noise, and screaming fits.
 

 Q. Ma’am,
 
 have you noticed any behavioral changes in Jasmine since Saturday June 15th?
 

 A.
 
 Yes, I have.
 

 Q. And would you describe just the behavioral changes for the jury, please?
 

 A. Jasmine has become-
 

 THE COURT: Keep your voice up.
 

 
 *255
 
 A.
 
 Jasmine is very petrified, of any strangers introduced to her or if there is any form of loud mise, yelling, anything, she has gotten so upset that she’s broken out in hives. She has nightmares and screaming fits.
 

 Q.
 
 Have you ever seen any of these behaviors prinr to June 15th?
 

 A.
 
 No.
 

 (Emphasis supplied).
 

 At that point Ms. Pritchett had not repeated a word that had been uttered by Jasmine and there was demonstrably no hearsay problem. The examination then proceeded:
 

 Q. Has she ever—you have never discussed this case with her, have you?
 

 A. No, I have not.
 

 Q. And has she ever—has she ever asked you any questions about it?
 

 A. She asked me if Erik was going to-
 

 MR.McFADDEN: Object.
 

 THE COURT: No, Pm going to overrule it.
 

 Q. Go ahead, ma’am.
 

 A.
 
 She asked me if Erik was going to get her.
 

 (Emphasis supplied).
 

 The issue is a very narrow one. Is a frightened eighteen-month-old’s question to her mother, “Is Erik going to get me?” an instance of hearsay? In
 
 Holland v. State,
 
 122 Md.App. 532, 543, 713 A.2d 364 (1998), we at least anticipated the question.
 

 When a, witness testifies as to words spoken by some other person
 
 on some other occasion,
 
 it has becom,e,
 
 sadly,
 
 a Pavlovian reflex among lawyers to leap to their feet and yell, “Hearsay!”
 
 The reflex is frequently as nonsensical as it is automatic.
 

 (Emphasis supplied). On this occasion, we are not suggesting that the reflex was nonsensical. It was, as the necessary complexity of our analysis will demonstrate, ingeniously clev
 
 *256
 
 er. Like Scrooge on Christmas Eve, we are confronted by the Ghost of the Hearsay Rule Past.
 

 The ABC’s of Hearsay As a Point of Analytic Departure
 

 To a student first embarking on Evidence 101, the key to understanding hearsay is, long before venturing into the thicket of the hearsay exceptions, to develop a sure “feel” for the difference between those utterances that are hearsay and those that are not. One must be able to negotiate the territory that McCormick called “the borderland of hearsay.”
 
 [6]
 
 It is not enough to know that a challenged statement is admissible. That can be a lucky guess. Is it admissible because the hearsay rule is satisfied?, or is it admissible because the hearsay rule is inapplicable?
 

 The classic classroom teaser posits a witness who testifies that he spoke by telephone with his brother in London, who said, “It is raining in London.” To the professor’s query as to whether that brotherly utterance is hearsay, the only intelligent answer is “I don’t have the foggiest.” It depends on the purpose for which the statement is offered. If it is offered to prove that at a given time it was raining in London, it is, of course, hearsay. If it is offered to prove that at a given time the brother was alive and able to speak, it is, with equal certainty, non-hearsay. The first purpose needs the brother to be shown to be trustworthy. The second purpose is indifferent to trustworthiness, and the hearsay rule is only designed to guarantee trustworthiness.
 

 In
 
 Ali v. State,
 
 314 Md. 295, 304, 550 A.2d 925 (1988), Judge McAuliffe gave a classic common law definition of hearsay.
 

 Hearsay is generally defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Thus, when a statement is offered for some purpose other than to prove the truth of the matter asserted therein, it is not hearsay.
 

 
 *257
 

 See also Burgess v. State,
 
 89 Md.App. 522, 537 n. 12, 598 A.2d 830 (1991).
 

 The Maryland Rules of Evidence, § 5-801(c), promulgated six years after
 
 Ali v. State,
 
 defined “hearsay” in almost verbatim terms.
 

 “Hearsay” is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.
 

 Federal Rule of Evidence 801(c), from which the Maryland Rule is derived, is absolutely verbatim with the Maryland definition.
 

 At the most basic level, under both the common law and the new Federal and Maryland Rules, a hearsay statement consisted routinely of the speaking of a declarative sentence in the indicative mood, which sentence stated the very fact which the proponent of the statement sought to prove by its use. Early on, however, it was recognized that a hearsay statement could be a writing of an assertion as well as a speaking of it. It was also universally recognized, virtually
 
 ab origine,
 
 that a hearsay statement could consist of a non-verbal action if the action were intended by the actor to be an assertion. The pointing of a finger at Suspect # 4 is just as assertive as are the words, “The man who robbed me is Suspect # 4.” Just as surely assertive, in response to a question, is a vertical shaking of the head (“Yes”), a horizontal shaking of the head (“No”), or a shrug of the shoulders (“I don’t know”).
 
 [7]
 

 Reflecting that common law understanding of a hearsay “statement” is Maryland Rule 5-801 (a).
 

 
 *258
 
 A “statement” is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.
 

 Federal Rule of Evidence 801(a), from which the Maryland Rule derives, is absolutely verbatim. To complete the three intertwined definitions that go into the collective definition of “hearsay,” both Maryland Rule 5-801(b) and Federal Rule of Evidence 801(b) define “declarant.”
 

 A “declarant” is a person who makes a statement.
 

 With the earlier, and essentially indistinguishable, common law counterparts of such definitions, the law of evidence had clean-cut paradigms of hearsay and of non-hearsay, and there was a well-marked boundary between them. The hearsay rule, without disruptive aberrations, was “ship shape and Bristol fashion.” Then Admiral Tatham elected to challenge his cousin’s will, and, even as we write, we are still being assailed by the consequences of that caveat.
 

 At the most basic level (pre-1838 and post-1994), little Jasmine’s question to her mother, “Is Erik going to get me?” clearly would not fit the hearsay mold. In
 
 Holland v. State,
 
 122 Md.App. at 543-44, 713 A.2d 364, we discussed the ordinarily tell-tale grammatical and syntactical characteristics of a hearsay statement.
 

 To qualify as hearsay, the words recounted
 
 in court
 
 must,
 
 for starters,
 
 constitute an assertion or statement of a fact.
 
 Many out-of-court utterances are self-evidently not assertions. If a witness testifies to the out-of-court inquiry, “What time is it?,” that inquiry is obviously not an assertion of anything.
 
 For an out-of-court utterance to qualify as an assertion, it generally must be in the indicative or declarative mood, rather than in the interrogative mood, the imperative mood, or the subjunctive mood.
 
 An out-of-court assertion of a fact may be true or untrue. For that reason, its admissibility in evidence is problematic if offered to prove that fact.
 
 An out-of-court inquiry, “What time is it?” can be, by its very nature, neither true nor untrue
 
 and there is, therefore, no such credibility problem.
 
 The out-of-
 
 
 *259
 

 court command, “Stop!” can be, by its very nature, neither true nor untrue
 
 and there is, therefore, no such credibility problem.
 

 (Emphasis supplied).
 

 In
 
 Burgess v. State,
 
 89 Md.App. at 537-38, 598 A.2d 830, Judge Alpert quoted with approval from D. Binder,
 
 Hearsay Handbook
 
 18 (3rd ed. 1991):
 

 Many out-of-court utterances fall within such categories as
 
 greetings, pleasantries, expressions of gratitude, courtesies,
 
 questions,
 
 offers, instructions, warnings, exclamations,
 
 expressions of
 
 joy, annoyance, or other
 
 emotion,
 
 etc.
 
 Such utterances are not intended expressions of fact
 
 or opinion.
 
 They are not assertions,
 
 at least for purposes of the hearsay rule.
 
 Thus they are not hearsay.
 

 “Hello.”
 

 “How are you?”
 

 “Have a nice day.”
 

 “Would you like to have lunch?”
 

 “I hope it doesn’t rain tomorrow.”
 

 “I wonder what he paid for that car.”
 

 “Thank you.”
 

 “Can you join me for a drink?”
 

 “Don’t do that, or else.”
 

 “Watch your step.”
 

 None of the above utterances is an intended expression of fact or opinion. None is hearsay.
 

 (Emphasis supplied). And see
 
 United States v. Oguns,
 
 921 F.2d 442, 448-49 (2d Cir.1990) (an inquiry is not an assertion);
 
 United States v. Long,
 
 905 F.2d 1572, 1579-80 (D.C.Cir.1990) (questions are non-assertive).
 

 To say that little Jasmine’s frightened question to her mother does not fit within the classic paradigm of hearsay, however, is not to say that it might not be embraced by the bloated definition of hearsay spawned by
 
 Wright v. Tatham.
 
 Indeed, the appellant proposes just that. He posits as an implied assertion the following attenuated inference: 1) From
 
 *260
 
 Jasmine’s question we may infer that Jasmine was afraid of Erik; 2) from Jasmine’s fear of Erik we may infer that Erik had done something to generate that fear; 3) from that likely causation, plus the timing, we may finally infer that Erik had assaulted Calen in the presence of Jasmine. The appellant then concludes that such an implied assertion is inadmissible hearsay. This argument requires us to turn our attention to the rise and fall of the implied assertion.
 

 The Rise and Fall of the Implied Assertion
 

 A. The Implied Assertion at Perihelion
 

 Having revisited briefly the heartland of the hearsay rule, we now venture into what was, for 136 years, its borderland. With the decision in
 
 Wright v. Tatum,
 
 Pandora’s Box was opened and implied assertions were loosed upon the law of evidence. Virtually any action or any utterance by someone not present in court to testify that had even circumstantial probative value could arguably be excluded as hearsay. Proceeding not from the holding of
 
 Wright v. Tatham,
 
 involving letters to Marsden which were at least verbal statements of something, but from
 
 Wright v. Tatham’s
 
 encyclopedic dicta, the notice of an implied assertion soon embraced not only non-assertive verbal utterances but, even more sweepingly, non-assertive non-verbal conduct as well.
 

 Wright v. Tatham’s
 
 illustrative hypothetical about a sea captain has become as famous as the decision in
 
 Wright v. Tatham
 
 itself. On the issue of whether a ship was seaworthy, the hypothetical evidence was that its captain thoroughly inspected the ship and then boarded it for a long sea voyage accompanied by his wife and children.
 
 Wright v. Tatham
 
 gave this as an example of an implied assertion. It was the initial predicate for a classic two-step inference:
 
 [8]
 
 1) it could be inferred from the captain’s actions that he believed the ship
 
 *261
 
 to be seaworthy; 2) it could, in turn, be inferred from his belief that the ship was, indeed, seaworthy.
 

 With that dicta, the notion of implied assertions was loose and running in an open field. Ronald J. Bacigal, “Implied Hearsay: Defusing the Battle Line Between Pragmatism and Realism,” 11
 
 Southern Illinois L.J.
 
 1127 (1987), observed, “The riddle of implied assertions has delighted academicians for 150 years with the subtleties of its intellectual challenges.” Almost every academic discussion of implied assertions now adds to the case of the sea captain the example of the raising of an umbrella as an implied assertion that it is raining. Circumstantial evidence of rain, to be sure, but an implied assertion? Does one who concluded that it was raining from looking out the window and seeing a dozen raised umbrellas need to produce the umbrella holders in court for cross-examination?
 
 [9]
 
 R. Lempert and S. Saltzburg,
 
 A Modem Approach to Evidence
 
 367 n. 41 (2d ed.1982), wonders if “the issue would not have disappeared entirely by now if the problems were not so intriguing to commentators and teachers of evidence.”
 

 B. Academic Disenchantment with the Implied Assertion
 

 In the Twentieth Century academic criticism of the implied assertion as something necessarily covered by the hearsay rule became widespread. One such criticism was that the very term “implied assertion” drained the word “assertion” of almost all of its intended content. “Assertion” traditionally connoted a deliberate communicative intention, something that “implied assertion” totally lacked. Mueller, “Post-Modern Hearsay Reform,” criticizes Baron Parke for having “broadly applied the term [implied assertion] across the board to any indication that any human behavior provides about acts, events or conditions, treating as hearsay all human conduct
 
 *262
 
 offered for the two-step inference.” Professor Mueller goes on:
 

 “[I]mplied assertion” is a singularly inept and artificial umbrella term. It requires us to understand “imply” in the weak sense of “suggest” or “indicate,” not in the usual strong sense of describing what a person means to convey. It divorces “assertion” from normal usage, making it mean essentially “evidence” and severing it from expressive or communicative purpose.
 

 If an ordinary letter is an implied assertion that its recipient is competent, then an overcast sky is an implied assertion that rain is in the offing. Absent an intent to express or communicate competence, it is no more illuminating to describe a letter as an implied assertion of this point than it is to describe clouds as implied assertions that it will rain.
 

 76
 
 Minn. L.Rev.
 
 at 419 n. 153.
 

 Another criticism of the expanded definition of hearsay was that the evidentiary reception of a merely implied assertion did not threaten the special dangers, particularly that of testimonial deception, that the hearsay rule was designed to forfend.
 
 McCormick on Evidence,
 
 at 110, measures implied assertions consisting of non-assertive non-verbal conduct against “the dangers which the hearsay rule is designed to guard against,” and concludes that such implied assertions are nothing more than circumstantial evidence and should not be embraced within a proper definition of hearsay.
 

 A satisfactory resolution can be had only by making an evaluation in terms of the dangers which the hearsay rule is designed to guard against, i.e., imperfections of perception, memory, and narration. It is believed that
 
 such an analysis can result only in rejecting the view that evidence of conduct, from which may be inferred a belief, from which in turn may be inferred the happening of the event which produced the belief, is the equivalent of an assertion that the event happened and hence hearsay.
 
 People do not, prior to raising their umbrellas, say to themselves in soliloquy form, “It is raining,” nor does the motorist go forward on
 
 *263
 
 the green light only after making an inward assertion, “The light is green.”
 
 The conduct offered in the one instance to prove it was raining and in the other that the light was green, involves no intent to communicate the fact sought to be proved,
 
 and it was recognized long ago that purposeful deception is less likely in the absence of intent to communicate.
 

 (Emphasis supplied).
 

 Even acknowledging that an opponent might wish, through cross-examination, to probe the actor’s perception and memory,
 
 McCormick
 
 still concludes that such evidence should not be subjected to the exclusionary sanction of the hearsay rule.
 

 Even though the risks arising from purposeful deception may be slight or nonexistent in the absence of intent to communicate, the objection remains that the actor’s perception and memory are untested by cross-examination for the possibility of honest mistake. However,
 
 in contrast to the risks from purposeful deception, those arising from the chance of honest mistake seem more sensibly to be factors useful in evaluating weight and credibility rather than grounds for exclusion.
 
 Moreover, the kind of situation involved is ordinarily such as either to minimize the likelihood of flaws of perception and memory or to present circumstances lending themselves to their evaluation.
 

 Id.
 
 (Emphasis supplied).
 

 Maguire, “Around and Through the Thicket,” p. 773, sadly described evidence as “a field of probative law long befogged by memories of
 
 Wright v. Tatham
 
 and by fitful revival of like uncertainties in the minds of perplexed lawyers.” Mueller, “Post-Modern Hearsay Reform,” p. 418, characterized the term “implied assertion” as an “ancient formalism which once described all human behavior (both assertive and non-assertive) when offered for the two-step inference.”
 

 C. The Retreat of the Implied Assertion From Hearsay Coverage
 

 The reaction against the implied assertion as an instance of hearsay finally reached critical mass with the promulgation of
 
 *264
 
 the Federal Rules of Evidence in 1973. By defining “hearsay” more tightly and precisely than the common law had done, Federal Rule of Evidence 801 effectively barred most, if not all, instances of what had been called “implied assertions” from the coverage of the hearsay rule.
 
 [10]
 
 Maryland Rule 5-801, effective in 1994, is based on Federal Rule 801(a), (b), and (c) and is indistinguishable from it.
 
 McCormick on Evidence,
 
 at 97, points out that, as of 1992, the definition of “hearsay” in Federal Rule 801 was in effect in about half the states and had, in addition, been quoted with approval or been adopted outright on a case-by-case basis in a number of other states where the Federal Rules had not been adopted in their entirety.
 

 As far as the definition of hearsay is concerned, Maryland Rule 5-801 is identical to Federal Rule 801(a), (b), and (c),
 
 [11]
 
 and there is no remote suggestion anywhere that Maryland’s interpretation will not follow the interpretation of its federal model. If any passing phraseology in the Maryland caselaw might seem at odds with the federal rule, what is almost certainly revealed is simply an inadvertent lapse of understanding or careless phrasing by the Maryland opinions and not a deliberate policy decision to have Maryland depart from its federal counterpart.
 

 1. Non-Assertive Non-Verbal Conduct
 

 Although the hearsay rule’s pull-back from the implied assertion has been a broad strategic retreat along the entire front, that front is divided into three separate sectors. The retreat in each sector requires a slightly different analysis. Those separate sectors are 1) non-assertive non-verbal conduct, 2) non-assertive verbal utterances, and 3) assertive ver
 
 *265
 
 bal utterances offered as a basis for inferring something other than the thing asserted (the two-step or attenuated inference).
 

 The exclusion from coverage of non-assertive non-verbal conduct is absolute and the easiest of the exclusions to analyze. Federal Rule 801(a) expressly provides that “nonverbal conduct of a person” qualifies as a “statement” only “if it is intended by the person as an assertion.” The Advisory Committee’s note to Federal Rule 801(a) explains in pertinent part:
 

 Some nonverbal conduct, such as the act of pointing to identify a suspect in a lineup, is clearly the equivalent of words, assertive in nature, and to be regarded as a statement.
 
 Other nonverbal conduct,
 
 however,
 
 may be offered as evidence that the person acted as he did because of his belief in the existence of the condition sought to be proved, from which belief the existence of the condition may be inferred.
 
 The sequence is, arguably, in effect an assertion of the existence of the condition and hence properly includable within the hearsay concept. Admittedly evidence of this character is untested with respect to the perception, memory, and narration (or their equivalents) of the actor, but
 
 the Advisory Committee is of the view that these dangers are minimal in the absence of an intent to assert and do not justify the loss of the evidence on hearsay grounds.
 
 No class of evidence is free of the possibility of fabrication, but the likelihood is less with nonverbal than with assertive verbal conduct. The situations giving rise to the nonverbal conduct are such as virtually to eliminate questions of sincerity.
 

 (Emphasis supplied).
 

 4 Stephen Saltzburg, Michael Martin, and Daniel Capra,
 
 Federal Rules of Evidence Manual
 
 (8th ed.), 801-14, unequivocally declares that the result of
 
 Wright v. Tatham’s
 
 hypothetical case of the sea captain would be different under Federal Rule 801 (and Maryland Rule 5-801).
 

 The result of the ship captain hypothetical changes under Rule 801. Conduct is not hearsay merely because it is offered to prove the truth of the belief that generated the
 
 
 *266
 

 conduct.
 
 Rather, under Rule 801,
 
 conduct can only be hearsay if the declarant intended by the conduct to communicate information.
 
 The Trial Judge has to determine whether conduct was intended to assert something or not. The Advisory Committee’s Note states that
 
 “[t]he rule is so worded as to place the burden upon the party claiming that the intention existed; ambiguous and doubtful cases uñll be resolved against him and in favor of admissibility.'”
 

 (Emphasis supplied).
 

 Paul S. Milich,
 
 Re-Examining Hearsay Under the Federal Rules: Some Method for the Madness,
 
 39
 
 Kansas L.Rev.
 
 893, 903, pronounces a similar obituary for the umbrella-opening example, as well as an obituary for the
 
 Wright v. Tatham
 
 approach generally.
 

 The text of Rule 801 itself does not support a Wright v. Tatham approach. Subsection (a)(2) rejects this approach in cases of nonverbal conduct.
 
 For example, to prove that it was raining at the time, witnesses testify that they saw Mary opening her umbrella as she was walking out the door.
 
 Under the Wright v. Tatham approach, this evidence is hearsay because Mary’s conduct implies that she believed it was raining and her belief implies that it was, in fact, raining. But the language of Rule 801(a)(2) points to a result at odds with the Wright v. Tatham approach:
 
 “Nonverbal conduct of a person” qualifies as a potential hearsay statement only “if it is intended by the person as an assertion.”
 
 Opening an umbrella normally is not intended to be an assertion about anything,
 
 and, thus,
 
 such nonverbal conduct does not fall within the federal definition of hearsay.
 

 (Emphasis supplied).
 

 Lynn McLain,
 
 Maryland Rules of Evidence
 
 (2d ed.2002), p. 183, was equally emphatic about the foreclosing effect of Maryland Rule 5-801 specifically. Non-assertive non-verbal conduct is not hearsay even if it can be characterized as an implied assertion. An observation about vocabulary is here in order. It is not that such conduct has been
 
 *267
 
 exempted from the category of “implied assertion.” It is rather that such implied assertions, notwithstanding their venerable label, have been exempted from the category of “hearsay.”
 

 Rule 5-801 is consistent with the pre-Title 5 Maryland law, with one clear exception. Under the Rule,
 
 a person’s nonverbal, nonassertive conduct
 
 (not obviously engaged in as a means to communicate particular, identifiable words)
 
 can never be hearsay, even if it is offered as an implied assertion
 
 by the out-of-court actor.
 

 For example, suppose that a ship has been lost at sea. If evidence that the ship’s captain inspected the ship, then boarded it with his family, and sailed away, is offered to prove that the ship was seaworthy at the time of sailing, it is offered as an implied assertion on the part of the captain of his apparent belief that “the ship is seaworthy.”
 
 This type of evidence was considered to be hearsay,
 
 in dictum
 
 in the famous English case, Wright v. Doe dem. Tatham,
 
 7 Ad. & E. 313, 112 Eng. Rep. 488 (1837), 5 Cl. & F. 136 (H.L. 1838), because its probative value to show the ship’s seaworthiness depended on the ship’s captain’s having had a particular belief (that the ship was seaworthy—not, for example, that he knew it was not seaworthy, but decided to take his chances, so as to escape a greater danger on his heels) and on his having been accurate as to the fact he apparently believed.
 
 Wright
 
 was followed by the Maryland Court of Appeals in
 
 Waters v. Waters,
 
 35 Md. 531, (1872), although
 
 Waters
 
 involved, as did the facts of
 
 Wright,
 
 an implied assertion from personal letters (verbal, not nonverbal, conduct).
 

 Under Rule 5-801, the Wright dictum can no longer be followed in Maryland courts, when the actor was engaging in nonverbal, nonassertive conduct.
 

 (Emphasis supplied).
 

 Professor McLain further notes, at p. 187:
 

 By vil fue of Rule 5-801(a)(2), nonverbal, nonassertive conduct
 
 (conduct that was neither in words nor obviously
 
 *268
 
 intended as a substitute for identifiable words, to convey a particular message)
 
 can never be hearsay, because it is not a “statement.” The Rule clearly rejects the reasoning of Wright v. Doe dem. Tatham,
 
 7 Ad. & E. 313, 112 Eng. Rep. 488 (1837), 5 Cl. & F. 136 (H.L. 1838), to the extent that
 
 Wright
 
 stands for the proposition that even nonverbal, nonassertive conduct will be hearsay, if it is offered as an implied assertion, i.e., as evidence manifesting the out-of-court actor’s belief, offered to prove the truth of the matter that the out-of-court actor apparently believed.
 

 (Emphasis supplied).
 

 With respect to non-assertive non-verbal conduct, the rules, Maryland and federal, have spoken. Even if arbitrary (which we are not suggesting), and even if to the chagrin of some academic commentators, that’s it! The debate is over. There is but to salute and advance on Balaklava Heights.
 

 2. Non-Assertive Verbal Utterances
 

 In that sector of the implied assertion front once garrisoned by non-assertive verbal utterances, there has also been a complete pull-back of hearsay coverage. In this sector, however, a slight fog over the terrain makes the perception of the pull-back a little less clear-cut than in the case of non-assertive non-verbal conduct. To clear away the fog, we must first identify what is non-assertive.
 

 The Committee Note to Maryland Rule 5-801, for instance, states:
 

 This Rule does not attempt to define “assertion,” a concept best left to. development in the case law. The fact that proffered evidence is in the form of a question or something other than a narrative statement, however, does not
 
 necessarily
 
 preclude its being an assertion.
 

 (Emphasis supplied).
 

 As the Committee Note points out, the fact that an utterance is in the form of a question “does not
 
 necessarily
 
 preclude its being an assertion.” (Emphasis supplied). Opportunistically, attorneys seize upon that last sentence as a
 
 *269
 
 fog-generating device. In the overwhelming majority of cases, of course, a question will not be an assertion. There are, however, rare exceptions, and those exceptions may be better illustrated than they may be defined.
 

 Professor McLain, at 183, offers the illustration that the question, “Did you know Scott stole my car?” is clearly an assertion that Scott stole the car. The “Did you know’s” generally are a fruitful source of assertive questions, as are questions beginning with “Why.” The sarcastic question can also be a bountiful source. Bacigal, “Implied Hearsay,” at 1139, offers the illustration of the declarant who, when asked, “Is that pure heroin?” sarcastically responds, “Do cops wear blue?” That clearly asserts that the substance being discussed is pure heroin.
 

 In
 
 Carlton v. State,
 
 111 Md.App. 436, 443, 681 A.2d 1181 (1996), Judge Salmon offered two additional examples of questions that could qualify as assertive.
 

 Many questions asked by an out-of-court declarant can be implied assertions. For example, the question, “Do you need change?” impliedly asserts that the questioner has change.
 
 State v. Saunders,
 
 23 Ohio App.3d 69, 491 N.E.2d 313 (1984). The question, “Why did you stab me, Brutus?” impliedly asserts that the questioner was stabbed by Brutus.
 

 A question that necessarily assumes a condition will almost always be an assertion of that condition. “Do you think it will stop raining within the hour?” necessarily asserts that it is raining now. The presence of the word “stop” in a question, or in a command for that matter, is a tell-tale clue of an assertion. It signals the difference between a non-declarative utterance that demands an inference and one that merely suggests an inference. Such assertive questions are, however, rare and they are not hard to identify. The Committee Note does not open the floodgates to questions generally and must not be overread. Ordinarily, a question, as a simple request for information, will not be an assertion.
 

 
 *270
 
 For an utterance to be assertive (and, therefore, to qualify as hearsay), the declarant must intend to assert something. The Advisory Committee Note to Federal Rule 801(a) could not be more clear.
 

 The effect of the definition of “statement” is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion.
 
 The key to the definition is that nothing is an assertion unless intended to be one.
 

 (Emphasis supplied). The Advisory Committee Note was also very clear about the allocation of the burden to prove the intent to assert and about the resolution of “ambiguous and doubtful cases.”
 

 The rule is so worded as to place the burden upon the party claiming that the intention existed;
 
 ambiguous and doubtful cases will be resolved
 
 against him and
 
 in favor of admissibility.
 

 (Emphasis supplied).
 

 Carlton v. State,
 
 111 Md.App. 436, 681 A.2d 1181 (1996), is a perfect case in point. Carlton was convicted of first-degree felony murder and armed robbery. Introduced into evidence against him was the testimony of a Ms. Shipley, who stated that an out-of-court declarant, Carlton’s confederate, Ussel, asked her certain questions about 1) the alarm system at the store where the robbery later took place and 2) the time that the store owner normally left for the night. Carlton’s objection was on hearsay grounds.
 

 Appellant does not contend that the questions asked by Ussel lacked relevance; instead
 
 he argues that allowing the jury to hear the questions violated the rule against hearsay.
 

 1111 Md.App. at 442, 681 A.2d 1181 (emphasis supplied).
 

 Judge Salmon held for this Court that those questions were not assertive and, therefore, were not hearsay.
 

 [Mjany, if not most, questions make no assertion; the questioner simply seeks answers. Burgess v. State,
 
 89 Md.App. 522, 537-38, 598 A.2d 830 (1991).
 
 The questions Ussel asked Ms. Shipley
 
 fall into this latter category.
 
 *271
 
 When Ussel asked, “Does Mr. Zinkhan have an alarm?” or “What time, if ever, will Mr. Zinkhan leave?” he
 
 made no explicit or implied assertion.
 
 Ussel’s questions could not possibly have been “offered in evidence to prove the truth of the matter asserted.” Therefore,
 
 the hearsay rule was not violated when Ms. Shipley was allowed, to repeat the questions Ussel asked her.
 

 111 Md.App. at 443, 681 A.2d 1181 (emphasis supplied).
 

 David E. Seidelson, “Implied Assertions and Federal Rule of Evidence 801: A Quandary for Federal Courts,” 24
 
 Duque,sne, L. Rev.
 
 741, 754 (1986), gives several examples of utterances that are obviously non-assertive because of the unequivocal absence of any intent to make “an assertion of anything to anyone.”
 

 Declarant, believing himself to be alone, hears a radio or television news bulletin which elicits from him a surprised, “Son-of-a-gun!” Subsequently, a witness offers to testify to declarant’s surprised exclamation as evidence that declarant had no previous knowledge of the matter reported in the bulletin. Opposing counsel’s hearsay objection would be overruled.
 
 Although declarant’s reaction, had been verbal, that verbalization had not been intended as an assertion of anything to anyone.
 
 Or, declarant, believing himself to be alone, sobs, “I don’t want to live to see another day.” Subsequently, a witness offers to testify to declarant’s mournful utterance as a means of proving that declarant then had a mind bent on suicide. Opposing counsel’s hearsay objection would be overruled. Again,
 
 although declarant’s conduct had been, verbal, that verbalization had not been intended as an, assertion of anything to anyone.
 

 (Emphasis supplied).
 

 Falknor, “The ‘Hear-Say’ Rule as a ‘See-Do’ Rule,” at 136 n. 2, points out how two actions that would have been classic implied assertions and consequential hearsay under the rationale of
 
 Wright v. Tatham
 
 are now understood to be non-
 
 *272
 
 assertive because of the fatal absence of any intent to communicate.
 

 [T]he passers-by had their umbrellas up for the sake of keeping dry, not for the purpose of telling anyone it was raining; the truck driver started up for the sake of resuming his journey, not for the purpose of telling anyone that the light had changed.
 

 Milich, “Re-Examining Hearsay,” at 907, stresses that a
 
 sine qua non
 
 of an assertion is the intent of the declarant to communicate the thing allegedly asserted.
 

 In sum, any interpretation of the federal definition of hearsay should recognize two facts: (1) the advisory committee endorsed the argument that
 
 use of nonverbal conduct should be governed by an intent-based distinction between assertive and nonassertive conduct;
 
 and (2)
 
 the advisory committee applied this same distinction to the use of implications from verbal conduct.
 
 As a result,
 
 “intent to communicate” is the key to distinguishing between hearsay and nonhearsay under the federal definition.
 

 (Emphasis supplied).
 

 The fact that an utterance may give rise to an inference of guilt does not make it an assertion within the contemplation of the hearsay rule as that rule is now defined.
 
 United States v. Zenni,
 
 492 F.Supp. 464 (E.D.Ky.1980), has become a classic illustration. While searching a premises for physical evidence of bookmaking, the police fielded several incoming telephone calls that directed the recipient of the call to place various bets on various sporting events. The prosecution introduced the contents of the calls 1) to prove that the callers believed the premises to be a bookmaking parlor and 2) to prove, in turn, that the premises were a bookmaking parlor.
 

 The defendant objected on the ground that the contents of the calls were implied assertions under
 
 Wright v. Tatham
 
 and were, therefore, inadmissible hearsay. The District Court first noted “the marked departure from the common law the
 
 *273
 
 Federal Rules have effected on this issue,”
 
 id.
 
 at 465, and then pointed out:
 

 [T]he utterance, “Put $2 to win on Paul Revere in the third at Pimlico,” is a direction and not an assertion of any kind, and therefore can be neither true or false.
 

 Id.
 
 at 466 n. 7.
 

 In rejecting the hearsay challenge, the court did not hold that the telephone calls were not “implied assertions,” as that term was formerly used, but that the telephone calls were not “assertions,” as that term is now used in defining hearsay.
 

 This court, therefore, holds that, “Subdivision (a)(2) of Rule 801 removes implied assertions from the definition of statement and consequently from the operation of the hearsay rule.”
 

 Applying the principles discussed above to the case at bar, this court holds that the utterances of the betters telephoning in their bets were nonassertive verbal conduct, offered as relevant for an implied assertion to be inferred from them, namely that bets could be placed at the premises being telephoned.
 
 The language is not an assertion on its face, and it is obvious these persons did not intend to make an assertion about the fact sought to be proved or anything else.
 

 Id.
 
 at 469 (emphasis supplied).
 
 [12]
 

 The
 
 Zenni
 
 court concluded:
 

 
 *274
 
 As an implied assertion, the proffered evidence is expressly excluded from the operation of the hearsay rule by Rule 801 of the Federal Rules of Evidence.
 

 Id.
 

 In
 
 United States v. Long, 905 F.2d
 
 1572 (D.C.Cir.1990), a premises was being searched for evidence of narcotics when an incoming caller sought to know whether Keith (the defendant Long) “still had any stuff.” As the officer sought clarification, the caller explained that she was asking about “a fifty.” Long objected to the contents of the call on the ground that it was an implied assertion that “Keith has crack and sells it.”
 

 In rejecting the challenge, the Fifth Circuit pointed out that nothing is an assertion unless it is intended to be an assertion.
 

 Although the rule does not define “assertion,” the accompanying advisory committee note stresses that
 
 “nothing is an assertion unless intended to be one. ”
 

 The caller’s words,
 
 thus,
 
 cannot be characterized as an “assertion, ” even an implied one, unless the caller intended to make such an “assertion. ”
 
 ...
 
 [T]he crucial distinction
 
 under rule 801
 
 is between intentional and unintentional messages,
 
 regardless of whether they are express or implied.
 
 It is difficult to imagine any question or for that matter any act, that does not in some way convey an implicit message.
 

 905 F.2d at 1579-80 (emphasis supplied).
 

 The Fifth Circuit acknowledged that the call could serve as a predicate for an inculpatory inference, but concluded that it was still not an intentional assertion.
 

 With our inquiry focused on the
 
 intent
 
 of the caller, we have little trouble disposing of Long’s theory about implied
 
 assertions____The caller may indeed have conveyed messages about Long through her questions, but any such messages were merely incidental and not intentional. Because the caller’s questions were nonassertive, they fall
 
 
 *275
 

 outside the scope of the hearsay rule,
 
 and the trial judge did not err in admitting the testimony concerning the questions.
 

 Id.
 
 at 1580 (emphasis supplied).
 

 In
 
 United States v. Lewis,
 
 902 F.2d 1176 (5th Cir.1990), the challenged telephone call had gone in the other direction. When the police arrested Lewis, they seized from him a pager or beeper. When the pager subsequently began beeping, the police dutifully called the number displayed on it and got the question, “Did you get the stuff?” In rejecting a hearsay challenge, the Fifth Circuit explained:
 

 The questions
 
 asked by the unknown caller,
 
 like most questions
 
 and inquiries,
 
 are not hearsay
 
 because they do not, and were not intended, to assert anything.
 

 902 F.2d at 1179 (emphasis supplied).
 

 The court pointed out that implied assertions have been largely removed from the coverage of the hearsay rule.
 

 Appellants argue that while the questions in this case are not direct assertions, there are certain assertions implicit in the questions. For example, they argue that implicit in the question “Did you get the stuff?” is an assertion that Lewis and/or Wade were expecting to receive some “stuff.” However,
 
 Rule 801, through its definition of “statement, ” forecloses appellants’ argument by removing implied asseiiions from the coverage of the hearsay rule.
 

 Id.
 
 (emphasis supplied).
 
 See also United States v. Jackson,
 
 588 F.2d 1046, 1049 n. 4 (5th Cir.1979).
 

 3. Assertive Utterances Offered to Prove Something Other Than the Thing Asserted
 

 The pull-back from hearsay coverage in the case of 1) non-assertive non-verbal conduct and 2) non-assertive verbal utterances has been a complete one. It is in the third sector, that occupied by assertive utterances wherefrom the thing asserted is to be inferred rather than having been stated directly, that the extent of the pull-back is more problematic. This is the one sector wherein the term “implied assertion” is not a misnomer.
 

 
 *276
 
 It is in this area that some implied assertions are still covered by the hearsay rule, although other implied assertions, even those produced by assertive utterances, are no longer covered. A distinction separating some implied assertions from others has been introduced by the new rules. It is an oversimplification, therefore, when commentators and opinion writers state that implied assertions are no longer covered by the hearsay rule. That is true, but it is only half true. Most of what were once called “implied assertions,” to be sure, are no longer covered. A few, however, remain covered.
 

 An assertive utterance need not state directly the thing that the declarant intends to assert. It may imply it. It may be in the form of a question, a command, a bit of sarcasm, a statement of something else. The implied assertion may be just as assertive as is a direct assertion. Only the communicative style or rhetorical flourish is different. The thing directly inferred from the words spoken, the thing the declarant intended to communicate, is, by definition, the implied assertion.
 

 Now comes the modern distinction: If the proposition, for which the utterance is offered as proof, is the same as the immediate or direct inference itself, to wit, a first generation implied assertion, the utterance is covered, as it always was, by the hearsay rule. The implied assertion that 1) is itself the probative end product and 2) results from a simple one-step inferential process is covered by the hearsay rule. The limitation on hearsay coverage introduced by the new rules, a limitation that was not part of the doxology according to
 
 Wright v. Tatham,
 
 is on the application of the hearsay rule to the more attenuated or multi-step inferential process. If the first generation inference is not the thing ultimately to be proved but is only the predicate for yet another inference one step further removed, the hearsay ban no longer stretches that far.
 

 Graham, “ ‘Stickperson Hearsay,’ ” 906, refers to utterances intended to trigger the more attenuated inferential process as “statements offered not for the truth of the matter asserted
 
 *277
 
 but rather as circumstantial evidence of a fact of consequence.” He observes that the Note of the Advisory Committee to Federal Rule 801 equated the attenuated inference with non-assertive non-verbal conduct in terms of the sincerity risk which is the major concern of the hearsay rule.
 

 If a statement, although assertive inform, is offered as a basis for inferring something other than the truth of the matter directly asserted,
 
 the Advisory Committee’s note to rule 801(a) indicates that
 
 the statement is “excluded from, the definition of hearsay
 
 by the language of subdivision (c).” The Advisory Committee’s claim rests on the assumption that such statements present a reduced sincerity risk similar to that associated with nonverbal conduct which is not intended as an assertion.
 

 (Emphasis supplied).
 

 The Advisory Committee Note itself, after considering at great length why non-assertive non-verbal conduct is no longer covered by the hearsay rule, adds that precisely the same considerations compel non-coverage in the case of assertive verbal utterances “offered as a basis for inferring something other than the matter asserted.”
 

 Similar considerations govern
 
 nonassertive verbal conduct and
 
 verbal conduct which is assertive but offered as a basis for inferring something other than the matter asserted, also excluded, from the definition of hearsay by the language of subdivision (c).
 

 (Emphasis supplied).
 

 McCormick on Evidence,
 
 at 98, is equally emphatic that an utterance merely serving as a predicate for an attenuated or second generation inference is not covered.
 

 The rule’s definition must be taken as meaning that
 
 out-of-court, conduct
 
 that is not an assertion, or
 
 that, even though assertive, is not offered to prove the truth of the matter asserted, is not hearsay.
 

 (Emphasis supplied).
 

 McLain,
 
 Maryland Rules of Evidence,
 
 at 193, offers several examples of utterances that would have been inadmissible
 
 *278
 
 implied assertions under
 
 Wright v. Tatham
 
 but would, in all likelihood, not be considered hearsay today. They would all be, even if implied assertions, assertions offered as a basis for inferring something other than the truth of the matter directly, albeit implicitly, asserted.
 

 Evidence Offered to Prove
 

 (2) Police officer testifies that when she answered the telephone in defendant’s apartment, a man on the other end said, “Have you still got the stuff?” Defendant was a drug dealer (caller believed that fact; evidence offered to prove accuracy of fact caller apparently believed).
 

 (3) Police officer testifies that, when she answered the telephone in defendant’s apartment, a man on the other end said, “$10 on the nose on # 5 in the 1st at Pimlico.” Defendant was a bookie.
 

 (4) Burglaiy victim identifies that, after she was blindfolded, she heard Bruce’s co-defendant say, “Bruce, get in here.” Bruce was one of the burglars.
 

 Murphy,
 
 Maryland Evidence Handbook,
 
 at 231-32, goes so far as to say:
 

 An “implied assertion” is not hearsay,
 
 under either FRE 801 or the definition of a hearsay “statement” used by Judge McAuliffe in
 
 Ali v. State, supra,
 
 314 Md. at 304, 550 A.2d at 929.
 

 ...
 
 Courtney [v. State,
 
 187 Md. 1, 48 A.2d 430 (1946)] is precedent for the admission of “implied assertions,” and
 
 correctly treats nonassertive conduct as circumstantial evidence of a material fact.
 

 (Emphasis supplied).
 

 Requiem for a Venerable Relic
 

 There is not much left to implied assertions. With respect to any lingering vitality in
 
 Wright v. Tatham,
 
 Federal Rule of Evidence 801 and Maryland Rule 5-801 effectively drove a stake to the heart. The
 
 coup-de-grace
 
 comes as a great loss
 
 *279
 
 to no one except true aficionados of the history of the law of evidence.
 
 Wright v. Tatham
 
 was great fun while it lasted, and it lasted a long time. R.I.P.
 

 “Is Erik Going to Get Me?”
 

 An eighteen-month-old child’s fearful question to her mother, “Is Erik going to get me?,” is clearly not hearsay under Maryland Rule 5-801 and Federal Rule of Evidence 801. It might once have been deemed an implied assertion under
 
 Wright v. Tatham.
 
 It does not qualify as hearsay today.
 

 Applying the analytic tools developed to measure conduct and utterances against the new rules, it is, as hearsay, twice bereft. A little girl’s fearful question to her mother was not intended by her to be a communicative assertion of any fact. It was, pure and simple, a frightened request for information. “Am I safe?” It was not assertive. For that reason alone, it was not hearsay.
 

 Even if the utterance could,
 
 arguendo,
 
 be deemed to be assertive, it still, moreover, was not offered as direct evidence of the ultimate issue. The arguably implicit assertion was not, “I saw Erik attack Calen.” It was, at most, “I am afraid of Erik.” That is not the proposition ultimately to be proved. The possibly implicit fear of Erik was only a circumstantial predicate for a more attenuated inference one or two steps farther down the inferential line. For this second reason alone, the utterance in question was not inadmissible.
 

 The case of
 
 In re Penelope B.,
 
 104 Wash.2d 643, 709 P.2d 1185 (1985), has much in common with the case before us. The new Washington rule of evidence defining hearsay was identical with Federal Rule 801(a), (b), and (c) and with Maryland Rule 5-801. At issue in that case were observations of social workers reporting the actions and the utterances of a six-year-old sexual abuse victim. In rejecting a defense claim of hearsay, the Washington Supreme Court first stated the law:
 

 
 *280
 

 The admissibility of nonassertive verbal or nonverbal conduct as circumstantial evidence of a fact in issue is governed by principles of relevance, not by hearsay principles.
 
 An assertion that is circumstantial evidence proves a fact indirectly, by implication; credibility of the declarant is not important because the relevance of the assertion does not depend on its truth.
 

 709 P.2d at 1191 (emphasis supplied).
 

 It then applied that law to the out-of-court utterances in issue:
 

 In the case before us,
 
 the child’s utterances
 
 showing precocious knowledge of explicit sexual matters and certain private names for male and female genitalia, as testified to by witnesses,
 
 are examples of nonassertive utterances which are not hearsay and are admissible.
 

 709 P.2d at 1192 (emphasis supplied).
 

 In
 
 State v. Stevens,
 
 58 Wash.App. 478, 794 P.2d 38 (1990), the defendant was convicted of two counts of first-degree statutory rape. The respective foster mothers of the six-year-old and three-year-old victims testified that both girls had nightmares in which they would cry out such statements as, “Arne, stop. Arne, don’t.” In affirming the convictions, the Washington Court of Appeals held that “the trial judge was correct in analyzing the testimony as nonhearsay.” 794 P.2d at 44. Although the nightmare utterances unquestionably gave rise to the inference that “Arnie did it,” the Court of Appeals ruled that the utterances, because they were non-assertive, were not hearsay.
 

 The utterances made by C and D during their sleep are not conscious, intentional assertions of fact or opinion.
 
 The nightmare statements are
 
 involuntary verbal reactions, and, as such, are
 
 nonassertive utterances and not hearsay.
 
 Rather,
 
 the utterances are circumstantial evidence that proves a fact indirectly
 
 that both children had nightmares involving Stevens.
 

 794 P.2d at 44 (emphasis supplied).
 

 In
 
 Church v. Commonwealth,
 
 230 Va. 208, 335 S.E.2d 823 (1985), the defendant was convicted of the rape of a seven-
 
 *281
 
 year-old girl. The girl’s mother testified that, several weeks after the rape, she noticed changes in her daughter’s behavior, including bed-wetting, nightmares, complaint of a vaginal itch, and fear of being left alone with her father or her brother. The mother then said that the child “had an obsession with my husband’s and my sex life. She would ask questions and when I’d give her an answer, she’d cry. She’d tell me she didn’t want me—us to do that because it was dirty, nasty and it hurt.” 335 S.E.2d at 825. The defendant objected on hearsay grounds.
 

 In affirming the conviction, the Supreme Court of Virginia held:
 

 The Commonwealth did not offer the child’s statement to prove that sex is “dirty, nasty and it hurt.” Rather, it was offered to show the child’s attitude toward sex, an attitude likely to have been created by a traumatic experience. Although the child made no prompt report of the crime, the Commonwealth was entitled to prove, by circumstantial evidence, that she had been a victim. Thus,
 
 the child’s out-of-court statement was not hearsay, but was admissible as circumstantial evidence tending to establish the probability of a fact in issue.
 

 335 S.E.2d at 825-26 (emphasis supplied).
 

 Judge Brown was correct in rejecting the hearsay challenge to Jennifer Pritchett’s testimony concerning her daughter’s question, “Is Erik going to get me?.” We agree that it was not hearsay.
 

 A Subjunctive Appeal Of a Hypothetical Issue
 

 The case on appeal must bear a reasonable resemblance to the case that was tried, and not to some other case that, in hindsight, might have been tried but was not. By way of a Parthian dart, the appellant alleges that the introduction into evidence of little Jasmine’s question to her mother, quite aside from any hearsay considerations, violated his Sixth Amendment right to confront his accusers. Did he really want to cross-examine an eighteen-month-old? Would the
 
 *282
 
 threat of perjury have enhanced the infant’s trustworthiness? At trial, however, the appellant made no mention of the confrontation clause. Indeed, the appellant’s brief to this Court made no mention of the confrontation clause. It appears that the appellate strategy was significantly overhauled after the initial brief was filed, and the entire confrontation issue is but an afterthought in the reply brief.
 

 The reply brief, to be sure, strives heroically to breathe life into the corpse. It points out that defense counsel, in challenging Jasmine’s question to her mother, discredited the utterance’s “reliability.” It then points out that the confrontation clause case of
 
 Idaho v. Wright,
 
 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), spends a lot of time discussing “reliability.” The very same word! Voila! The raising of a major constitutional issue, however, requires something more palpable than “a haze on the far horizon.”
 
 [13]
 

 The reply brief, in a last gasp, asks us to consider gratuitously the confrontation issue by way of noticing plain error. We have serious reservations about our authority to do so, notwithstanding the promiscuous overuse of that notion in recent years. It is unnecessary to decide the authority question, however, since we have no wish to take notice in any event. A consideration of the confrontation issue might well entail an analysis as lengthy as that which the hearsay rule has already engendered. Sir Walter Raleigh and Justice Scalia
 
 [14]
 
 will have to be saved for another day.
 

 Fatal Variance Between What Was Argued Then And What Is Being Argued Now
 

 Appellate advocates, like prom queens, should learn to heed the ancient wisdom, “You dance with the guy that brung ya.” The appellant, unheeding, is attempting to change doctrinal partners in the middle of the cotillion.
 

 
 *283
 
 In his second contention, the appellant argues that Judge Brown, on three separate occasions, allowed witnesses to testify to the appellant’s “reputation for violence as well as to numerous examples of prior acts of violence,” in contravention of Maryland Rule 5-404(b) and the attendant procedures required by such cases as
 
 Streater v. State,
 
 352 Md. 800, 724 A.2d 111 (1999), and
 
 State v. Faulkner,
 
 314 Md. 630, 552 A.2d 896 (1989). As with Ulysses shielding himself from the sirens, however, our ears are closed to this argument. With tunnel vision, we are focusing exclusively on the trial as it actually was and not on the trial as the appellant would now like it to have been.
 

 The express nature of this contention is made indisputably clear by the very titling of the contention in the appellant’s brief to this Court.
 

 THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF APPELLANT’S CHARACTER AND REPUTATION FOR VIOLENCE AS WELL AS NUMEROUS EXAMPLES OF PRIOR ACTS OF VIOLENCE.
 

 The appellant is counterattacking where there has been no attack to counter. He argues this issue as if the State had attempted to introduce his character for violence into the trial as substantive evidence of his probable guilt. He plants his feet firmly in Rule 5-404(b) and unlimbers the elaborate body of caselaw circumscribing the State’s use of a defendant’s character. He sets out the three-stage inquiry mandated by such cases as
 
 Streater
 
 and
 
 Faulkner
 
 before a defendant’s character may be used as substantive evidence of guilt. He points out how the State would have faltered at each of those stages, by failing 1) to establish any special relevance or purpose for the character evidence such as proof of motive, opportunity, intent, common scheme, etc.; 2) to satisfy the trial judge by clear and convincing evidence that the prior bad acts actually occurred; and 3) to convince the court that the probative value of the character evidence outweighed its likely prejudice.
 

 
 *284
 
 All of that, however, concerns a phantom trial that never happened. The State never offered the appellant’s character as substantive evidence of his guilt. Maryland Rule 5-404 was never mentioned and was not remotely an issue. Neither
 
 Streater
 
 nor
 
 Faulkner
 
 nor any of the “other crimes” or “prior bad acts” cases were so much as alluded to.
 

 Evidence that three State’s witnesses were afraid of the appellant and of why they were afraid of him came in pursuant to Maryland Rule 5-616, which provides in pertinent part:
 

 (c)
 
 Rehabilitation. A witness whose credibility has been attacked may be rehabilitated by:
 

 (1)
 
 Permitting the witness to
 
 ...
 
 explain impeaching facts
 
 ...;
 

 (2) ... evidence of the witness’s prior statements that are consistent with the witness’s present testimony, when their having been made detracts from the impeachment;
 

 (A) Other evidence that the court finds relevant for the purpose of rehabilitation.
 

 (Emphasis supplied).
 

 Nick Dieter took the stand for the State and gave evidence against the appellant. On cross-examination, his credibility was impeached by a showing that he had earlier “lied to the police” by telling them that he did not even know the appellant. By way of rehabilitation on redirect examination, he explained his earlier lack of candor to the police.
 

 Q. Now why did you lie in your initial statement to the police?
 

 A. I was scared that if I brought Erik into this situation he would take some repercussive action against me.
 

 Q. What does that mean?
 

 A. If Erik would get angry with me, he wouldn’t hesitate to assault me.
 

 In
 
 Washington v.
 
 State, 293 Md. 465, 468-72, 445 A.2d 684 (1982), Judge Eldridge examined at length the use of 1) a
 
 *285
 
 witness’s fear and 2) threats to that witness as proper rehabilitation of impeached testimonial credibility.
 
 [15]
 

 Pursuant to the rule permitting explanations of prior inconsistent statements, it is generally held that
 
 evidence of threats to a witness or fear on the part of the witness, in order to explain an inconsistency, is admissible in criminal cases for credibility rehabilitation purposes.
 

 293 Md. at 469, 445 A.2d 684 (emphasis supplied).
 
 See also State v. Werner,
 
 302 Md. 550, 560-61, 489 A.2d 1119 (1985) (“[E]vidence of the defendant’s other crimes is admissible in a criminal case to rehabilitate a State’s witness once the witness has been impeached in a substantial respect.”);
 
 Brown v. State,
 
 80 Md.App. 187, 193-95, 560 A.2d 605 (1989).
 

 Sharon Englebach also testified for the State. She had also earlier failed to have been completely forthcoming with the police. On direct examination she explained:
 

 Q. And in your interview with the police did you mention that the defendant lived there?
 

 A. No.
 

 Q. Why didn’t you?
 

 A. I was scared.
 

 Q. Why were you scared?
 

 A. Because what Erik wants Erik gets.
 

 Q. What do you mean what Erik wants Erik gets?
 

 [DEFENSE COUNSEL]: Object.
 

 Q. Let me rephrase.
 

 THE COURT: Thank you.
 

 Q. Why were you afraid of the defendant?
 

 [DEFENSE COUNSEL]: Object.
 

 
 *286
 
 THE COURT: No, overruled.
 

 A. He has a history of being violent towards people.
 

 On this occasion, to be sure, the State jumped the gun by way of anticipating rehabilitation. At trial, however, the timing of the rehabilitation was not raised as an issue. Indeed, in the appellant’s primary brief, that procedural stumble is not even mentioned. The brief argued all three instances together and only in the context of Rule 5-404(c), not in the context of Rule 5—616(c). Particularly in view of the wide discretion
 
 given to
 
 trial judges in making evidentiary rulings, we would hold that, even if the anticipatory timing of the rehabilitation were error, such error was harmless beyond a reasonable doubt.
 

 Cheryl Dieter, Calen’s mother and the appellant’s live-in girlfriend, gave a detailed written statement to the police, significantly inculpating the appellant. At trial, however, she almost totally recanted. In examining her, as an essentially hostile witness at that point, the State had Cheryl read some of her answers from her earlier statement to the police, in which she acknowledged that the appellant had threatened to hurt anyone who testified against him. She acknowledged her fear of the appellant because of earlier beatings. It was necessary for the State to show why a key witness was recanting on the stand.
 

 It is unnecessary to go into an elaborate analysis about the latitude allowed to the State because the contention now argued by the appellant on appeal has essentially nothing to do with Rule 5-616 (which is not even mentioned by the appellant), with rehabilitation by way of explaining prior inconsistent statements, with impeachment by prior inconsistent statements, or by showing a reason for a witness’s recantation on the stand. None of these purposes, which were the basis for the trial rulings, have anything to do with the use of the appellant’s character for violence as evidence of guilt. None of the trial-related arguments or rulings had anything to do with Rule 5-404, which is essentially the only thing being argued before us.
 

 
 *287
 
 We are not going to discuss further the rulings that were actually made, because they are not the subject of what is basically being argued before us. We are not going to discuss what is being argued before us, moreover, because that argument involves 1) evidentiary purposes that were never proposed, 2) evidentiary objections that were never raised on the grounds now suggested, and 3) evidentiary rulings on objections that were never made.
 

 JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.
 

 [1]
 

 . Christopher B. Mueller, “Post-Modern Hearsay Reform: The Importance of Complexity,” 76
 
 Minn. L. Rev.
 
 367, 418 n. 153 (1992).
 

 [2]
 

 . The fullest and most entertaining account of this eight-year struggle of kingdom-wide notoriety can be found in John M. Maguire, “The Hearsay Thicket: Around and Through the Thicket,” 14
 
 Vanderbilt L. Rev.
 
 741, 749-60 (1961). In contrast to Admiral Tatham’s scathing characterization of his cousin, Prof. Maguire has synthesized from the compendious legal reports and press accounts of the trial, a mellower portrait of John Marsden.
 

 He was a mild, polite, shrinking, shortish man, not bad-looking and with "fresh colour,” rather afraid of dogs, big or little, at ground level and of horses when he attained the elevation of the saddle. Although friendly and hospitable, he did not carve well enough to meet the demands of a table at which many were habitually served. So
 
 *251
 
 myopic that lie could not recognize people even a few yards away, he had a habit of contracting his brows and distorting his face to overcome the visual difficulty. He was quite uneducated, entirely unmarried, and sometimes bumbling in the presence of ladies. The ringing of bells fascinated him; so did check aprons worn by the servant maids.
 

 Id.
 
 at 750.
 

 [3]
 

 . Professor Maguire characterized the case as an almost miraculously appointed opportunity for authoritative determination of the claim that where there is no intentional communication of the proposition at issue, where that proposition is come at only by inference, there can be no hearsay.
 

 14
 
 Vand. L. Rev.
 
 at 752.
 

 [4]
 

 . The decision by the House of Lords produced 17 separate judicial opinions.
 

 [5]
 

 . It is to be hoped that Professor Maguire did not have
 
 Waters v. Waters
 
 and
 
 Eiland v. State
 
 in mind when he concluded:
 

 [I]t must, with considerable shame, be conceded that subsequent judicial analyses and pronouncements in the United States have not, on the whole, greatly advanced comprehension of the evidentiary problems raised by the battle over John Marsden’s will.
 

 14
 
 Vand. L. Rev.
 
 at 754. In Joseph F. Murphy, Jr.,
 
 Maryland Evidence Handbook,
 
 § 702(B), p. 261 (3rd ed. 1999), Chief Judge Murphy observed with respect to
 
 Waters v. Waters:
 

 Waters,
 
 now limited to testamentary capacity cases, will probably be overruled the next time an appellate court has the opportunity to do so.
 

 This may be that golden opportunity.
 

 [6]
 

 . Charles McCormick, “The Borderland of Hearsay,” 39
 
 Yale L.J.
 
 489 (1930).
 

 [7]
 

 . 2
 
 McCormick on Evidence
 
 (4th ed. 1992), § 250, p. 107, points out that a non-verbal assertion “receives the same treatment as oral or written assertions,” with one nuance of procedural difference.
 

 [T]he only difference is that an oral or written assertion is assumed, without further ado, to have been intended as such by virtue of being assertive in form, while
 
 in the case of the non-verbal conduct an intent to assert must be found by the judge as a precondition to classification as hearsay.
 

 (Emphasis supplied).
 

 [8]
 

 . A two-step (or even three-step) inferential process has sometimes been referred to as the drawing of an attenuated inference.
 

 [9]
 

 . The definitive analysis of non-verbal conduct as implied assertions was that by Judson F. Falknor, “The ‘Flear-Say’ Rule as a 'See-Do' Rule: Evidence of Conduct,” 33
 
 Rocky Mt. L. Rev.
 
 133 (1961).
 

 [10]
 

 .
 
 United States v. Zenni,
 
 492 F.Supp. 464, 465 (E.D.Ky.1980), referred to "the marked departure from the common law the Federal Rules have effected on this issue.”
 

 [11]
 

 . The fact that Maryland Rule 5-801 contains no corollary to Federal Rule 801(d) involves an essentially academic debate over conceptualization that is not at all pertinent to the definition of hearsay now under discussion.
 

 [12]
 

 . In the words of Alice in
 
 Alice in Wonderland,
 
 our language keeps getting "curioser and curioser." An implied assertion is not necessarily an assertion. The problem, of course, is that the phrase "implied assertion,” in widespread use for 150 years, had nothing to do with an action's or an utterance’s being assertive. It was simply a poor choice of words to connote the capacity of the action or the utterance to be, circumstantially, the trigger for an inference. The sophisticated may be comfortable with it, but the very idea of a non-assertive assertion is going to continue to trip a lot of people up. It is mind-boggling how many legal problems turn out to be the product of linguistic imprecision.
 

 [13]
 

 . From “Each in His Own Tongue" by William Herbert Carruth.
 

 [14]
 

 . See
 
 Crawford v. Washington,
 
 541 U.S. -, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
 

 [15]
 

 . In his reply brief, the appellant argues that
 
 Washington v. State
 
 was "decided prior to" the "development of the three-pronged test to determine the admissibility of ‘other crimes' evidence in
 
 State v. Faulkner,"
 
 and that the
 
 Washington
 
 holding must now be modified to fit into
 
 Faulkner’s
 
 three-pronged approach.
 
 Washington
 
 and
 
 Faulkner,
 
 however, do not even deal with the same subject matter. The appellant is comparing apples and oranges.