681 A.2d 1181

**David CARLTON**

v.

**STATE of Maryland.**

No. 1834, Sept. Term, 1995.

Court of Special Appeals of Maryland.

Sept. 3, 1996.

Arthur A. Delano, Jr., Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Tarra DeShields–Minnis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Sandra A. O'Connor, State's Attorney for Baltimore County, Towson, on the brief), for Appellee.

Submitted before WILNER, C.J., and MOYLAN and SALMON, JJ.

SALMON, Judge.

On September 13, 1995, David Carlton, appellant, was convicted by a jury of first degree felony murder and robbery with a deadly weapon. Baltimore County Circuit Court Judge William Hinkel sentenced appellant to life without possibility of parole on the felony murder count and a twenty year concurrent sentence for robbery with a deadly weapon. Appellant raises two issues on appeal:

1. Did the trial judge err in admitting an alleged accomplice's extrajudicial statements?

2. Should the sentence for robbery with a deadly weapon have been merged into the sentence for felony murder?

### FACTS

The bloody and severely beaten body of Robert Zinkhan, age 53, was found outside the A to Z Garden Center ("the Garden Center") at approximately 9:00 a.m. on December 23,

1994. The Garden Center was owned by Mr. Zinkhan and was located on Belair Road in Baltimore County, Maryland.

Two days after Mr. Zinkhan's body was discovered, the police arrested appellant and one Steven Ussel in Jacksonville, Florida. The two were charged with the murder of Mr. Zinkhan. In a search incident to their arrest, police recovered, *inter alia,* clothing belonging to appellant with Mr. Zinkhan's blood on it.

Shortly after his arrest, Ussel gave two statements to the police in which he admitted that he had helped appellant rob Mr. Zinkhan. According to Ussel, Mr. Zinkhan was killed, during the course of a robbery, when appellant beat Mr. Zinkhan, using a pole.

Appellant also gave a written statement to the police. He admitted being in the company of Ussel on the night of the murder but asserted that he took no part in the robbery or beating of Mr. Zinkhan and did not know of either the robbery or the murder until he was arrested. He stated:

On Thursday evening, 12/22/94, Steve [Ussel] and I were walking down Belair road. Steve said he had to visit a friend about some money that was owed to him at that A to Z Greenery [sic]. When we got there, he told me to wait in front of the place. Then walked to the other side of the front door, where he proceeded to talk to an ex-girlfriend. They talked for about 15 to 20 minutes. Then she went inside for about ten minutes.

She came out with two sandwiches, one for Steve and one for me. Then she gave Steven $10. Then she said, don't forget, after eleven p.m., you can get your money.

Steve and I left the place, went and got a six pack of beer, I asked him what she meant by after eleven p.m. Steve told me that he had to come back after eleven p.m. to collect money that was owed to him. I said okay.

We came back after 11 p.m. We parked across the street from A to Z Greenery [sic]. He told me that he would be back in about 20 minutes. I said okay. So I sat there drinking my last beer.

Twenty minutes has [sic] gone by. I began to wonder where Steve is. So I got out of the truck we were in. I proceeded to cross the streets of Belair Road from A to Z. When I crossed the parking lot of A to Z, I see Steve over top of someone.

I then ran to where Steve was and pushed him off of another man. I said, what the hell is going on? I looked down at the man and I saw some blood coming out of his nose. And before I could turn around, someone hit me on the head and on my right shoulder.

I must have passed out. When I woke up, I was closer to the parking lot of A to Z.

Steve said, come on before the guy, this guy calls the cops on me.

We then ran back to the truck and took off. From that night on until 11/25/94 [sic], I did not watch the news so I didn't know that Steve had killed anyone.

I asked him who hit me. He told me he did not know.

I wish I would have knowed [sic] that he killed the man. I would have turned him in myself. I only thought they were fighting.

After we got to Virginia, Steve told me that the guy paid him some of the money that was owed to him.

I said, that was cool. Steve asked me if I could go in the liquor store and get a case. I said fine.

When I handed Steve back the change, he pulled out a big wad of money. I asked him how much money did the guy owe you? He said, about $1800. Steve told me he had about $900 on him.

He would give his Mom the rest of the money he owed Steve. Steve said his mom would send it to him once we got to Florida.

I asked Steve why he had to leave tonight and not tomorrow after I picked up my last paycheck so I would have money on me. He said he had to be in Florida by a certain time.

Then he said, if its money you are worried about, here is $200. Just have your mom mail your check down to Florida, you can pay me back. I said fine.

In the meantime, we proceeded to Florida. We stopped off here and there, got some more beer, had some fun. Stopped off at South of the Border for about four to six hours.

We ate, played games, drank some more. Then we got to Florida, rented a room, spent some more money. Then we got pulled over on the 24th. The police let us go.

Then on the 25th, I asked Steve to stop at a phone so I could call my son and his mother and wish them a happy Christmas.

By the time I used the phone, police came up on us and arrested us. I kept asking why am I being arrested? They told me for first degree murder. When Detective Duckworth asked me about what happened, I could not answer him because I was not clear myself about what was going on.

A couple of the guys where I was being held helped me remember what happened the night of 12/22/94. I still have a little bump on my head.

When I was in court in Florida, the black guy next to me told me Steve said he is the one who hit me, that he wanted me there just like the other guy he hit on.

After giving the police a handwritten statement, appellant answered a series of questions. At the conclusion of the statement, appellant said,

I want to make sure that after I walked over to A to Z and saw Steve over him, that I pushed Steve away from the man. I did not know that he was that bad off or I wouldn't have ran. I thought Steve only hit him in the nose a couple of times. I'm sorry that this man had died the way he did.

At trial, the State called Sandra Shipley as its first witness. Ms. Shipley was an employee of the Garden Center who worked on December 22, 1994 from 9:00 a.m. to 7:00 p.m. She was an acquaintance of Ussel. About 6:00 p.m. on December

22, 1994, she spoke for about five to ten minutes with Ussel, who was accompanied by a white male whom Ms. Shipley was unable to identify at trial. Ussel asked Ms. Shipley for ten dollars for lodging and for food. Ms. Shipley gave him the money and two sandwiches.

While Ussel's companion stood seven to eight feet from her, Ussel asked Ms. Shipley several questions about Mr. Zinkhan. Over objection by appellant's counsel, Ms. Shipley testified:

A. I can't say in exact words, but I know that he [Ussel] asked me about when he [Mr. Zinkhan] would leave, if he had an alarm. He just kept asking me if I knew if he was leaving that night. Those things.

Q. Okay.

A. Mainly about whether he was leaving or not that night.

The State also called Christine Hinton, another friend of Ussel's. Ms. Hinton testified that, shortly before Christmas 1994, she encountered Ussel and appellant in a shopping mall. The threesome had a conversation that lasted approximately five to ten minutes. Ms. Hinton testified, over appellant's objection, that, while appellant was standing next to Ussel, Ussel said that "he knew someone that worked on Belair Road that he was going to rob." Ms. Hinton then inquired, "What happens if you get caught?" Over objection, Ms. Hinton testified that either Ussel or appellant (Ms. Shipley was not sure who) answered her question by stating, "[W]ell, we're going to kill him if we get caught."

Appellant did not testify at trial but, using the statement that he had given the police as a foundation, took the position that he took no part in either the robbery or the killing of Mr. Zinkhan and that he did not even know of the robbery until his arrest. In an effort to convince the jury that he had been duped by Ussel and that Ussel was using him as a scapegoat, appellant introduced into evidence the two written statements Ussel had given to the police in which Ussel blamed appellant for the brutal beating and murder of Mr. Zinkhan.

## I. *MS. SHIPLEY'S TESTIMONY*

█ In essence, the objected to questions asked of Ms. Shipley by Ussel were: 1) When, if at all, would Mr. Zinkhan leave the Garden Center on the night of December 22, 1994? and 2) Did Mr. Zinkhan have an alarm? Appellant does not contend that the questions asked by Ussel lacked relevance; instead he argues that allowing the jury to hear the questions violated the rule against hearsay.

Maryland Rule 5–801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Maryland Rule 5–801(a) defines the term "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion."

The text of Rule 5–801 is substantively the same as Federal Rule 801(a)-(c). Under the federal rule, courts have taken divergent positions as to when, if ever, an implied assertion is an assertion within the meaning of Rule 801(a)(1). LYNN McLAIN, MARYLAND RULES OF EVIDENCE 214–217 (1994 ed.). There are three basic approaches under federal decisions: 1) That "no implied assertions from statements are hearsay" (*id.* at 214); 2) that "implied assertions from verbal statements are hearsay" (*id.* at 215); and 3) that implied assertions are hearsay unless "there is no possibility that the declarant intended to leave a particular impression" (*id., quoting Park v. Huff,* 493 F.2d 923, 927 (5th Cir.1974), *withdrawn on other grounds,* 506 F.2d 849 (en banc), *cert. denied,* 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975)). The committee note to Maryland Rule 5–801 states that the fact that evidence "is in the form of a question or something other than a narrative statement ... does not necessarily preclude its being an assertion." Based on the committee note, it would appear that the drafters of Maryland Rule 5–801 rejected the view that implied assertions are never hearsay. At common law, Maryland recognized implied assertions as hearsay. *See Waters v. Waters,* 35 Md. 531, 544–45 (1872); *Eiland v. State,* 92

Md.App. 56, 81–82, 607 A.2d 42 (1992); *rev'd on other grounds, sub nom. Tyler v. State,* 330 Md. 261, 623 A.2d 648 (1993); *Eades v. State,* 75 Md.App. 411, 426–27, 541 A.2d 1001, *cert. denied,* 313 Md. 611, 547 A.2d 188 (1988).

■ Many questions asked by an out-of-court declarant can be implied assertions. For example, the question, "Do you need change?" impliedly asserts that the questioner has change. *State v. Saunders,* 23 Ohio App.3d 69, 491 N.E.2d 313 (1984). The question, "Why did you stab me, Brutus?" impliedly asserts that the questioner was stabbed by Brutus. On the other hand, many, if not most, questions make no assertion; the questioner simply seeks answers. *Burgess v. State,* 89 Md.App. 522, 537–38, 598 A.2d 830 (1991). The questions Ussel asked Ms. Shipley fall into this latter category. When Ussel asked, "Does Mr. Zinkhan have an alarm?" or "What time, if ever, will Mr. Zinkhan leave?" he made no explicit or implied assertion. Ussel's questions could not possibly have been "offered in evidence to prove the truth of the matter asserted." Therefore, the hearsay rule was not violated when Ms. Shipley was allowed to repeat the questions Ussel asked her.

## II. *MS. HINTON'S TESTIMONY*

■ Appellant also claims that the hearsay rule was violated by Ms. Hinton's testimony that Ussel told her 1) that he planned to rob someone on Belair Road and 2) that either appellant or Ussel said that if they were caught they were going to kill the robbery victim.

We will assume for purposes of this case, as appellant does, that the statement, "[W]e're going to kill him if we get caught," was made by Ussel and not appellant. There were two possible reasons the State wanted to put before the jury what Ussel said he planned to do. It was important for the State to prove what appellant knew and when he knew it because appellant claimed he accompanied Ussel to the Garden Center thinking that Ussel was there merely to seek repayment of a debt. By offering Ussel's statements into

evidence, the State presented circumstantial proof that appellant had notice that there was to be a robbery of the Garden Center, which was located on Belair Road. If the statement was introduced to show notice, it was not hearsay. 6 LYNN McLAIN, MARYLAND PRACTICE—MARYLAND EVIDENCE STATE AND FEDERAL § 801.9, 280–81 (1987) ("Statements which are relevant because a particular person saw or heard them and are offered to prove the effect on the hearer or reader are nonhearsay."). There was a second reason, however, why the State may have wanted to introduce into evidence what Ussel said he planned to do. That second reason was to prove the truth of the matter asserted, *i.e.*, that Ussel did plan to rob and possibly kill a robbery victim located on Belair Road. As part of their proof, the State needed to prove who robbed Mr. Zinkhan. The State contended that Ussel and appellant committed the robbery together. This statement helped prove that Ussel participated in the robbery. If Ussel's statements were introduced to prove the truth of what Ussel said, his statements were hearsay as defined in Rule 5–801. Fortunately for the State, however, Ussel's statements plainly came within a well-recognized exception to the hearsay rule, *i.e.*, an exception for statements of the declarant's state of mind. This exception and its rationale were explained in *McLain*, § 803.1, 359:

> [T]he statement of present state of mind which includes a statement looking forward into the future is admissible to show that the declarant subsequently acted in accordance with his or her stated intention. Again, there can be no perception or memory problems. There can be, of course, changes in plans or circumstances which interfere with the declarant's accomplishment of the stated goal. A jury should be capable of taking that possibility into account, so as not to give the statement undue weight.

(Footnote omitted.) *See also Maryland Paper Prods. Co. v. Judson*, 215 Md. 577, 590–91, 139 A.2d 219 (1958) (reversible error to refuse to allow deceased wife to testify that, on morning of fatal accident, deceased had told her that he intended to stop on the way to work to pick up a gear wheel to

be used in one of his employer's machines; evidence was admissible to show that deceased was acting in course of employment at time of accident).

Maryland Rule 5–803 retains the common law hearsay exception for statements of a declarant's present state of mind that looks to the future. The rule reads, in pertinent part:

> The following are not excluded as hearsay, even though the declarant is available as a witness ... (b) ...
>
> (3) Then Existing Mental, Emotional, or Physical Condition
>
> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or the declarant's future action, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The trial court did not err in allowing Ms. Hinton to testify as to what Ussel told her regarding his plans.[1]

## III.

█ Appellant also asserts that the trial court erred in imposing a separate sentence for his felony murder conviction and his robbery with a deadly weapon conviction. He contends, and the State agrees, that the underlying felony conviction (robbery with a deadly weapon) merges into the felony murder conviction. We likewise agree. *State v. Rivenbark,*

---

1. In their briefs, both appellant and the State discuss whether Mr. Hinton's testimony was admissible under the co-conspirator's exception to the hearsay rule as set forth in Maryland Rule 5–803(a)(5). Appellant argues that the statements of Ussel do not fit within that exception because the State "must first establish, through evidence aliunde, the existence of conspiracy." Appellant claims that the State failed in this regard and therefore the exception was inapplicable. Because we hold that the exception set forth in 5–803(b)(3) was applicable, we need not decide this issue.

311 Md. 147, 161 n. 5, 533 A.2d 271 (1987); *State v. Frye,* 283 Md. 709, 722, 393 A.2d 1372 (1978).

**FELONY MURDER JUDGMENT AFFIRMED; SENTENCE AS TO ROBBERY WITH A DEADLY WEAPON VACATED; COSTS TO BE PAID 75% BY APPELLANT AND 25% BY BALTIMORE COUNTY.**