960 A.2d 649

**Alphonso GARNER**

v.

**STATE of Maryland.**

**No. 0818, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Dec. 1, 2008.

Piedad Gomez (Nancy S. Forster, Public Defender on the brief), Baltimore, for appellant.

Gary E. O'Connor (Douglas F. Gansler, Attorney General on the brief), Baltimore, for appellee.

Argued before HOLLANDER, CHARLES E. MOYLAN, JR., (retired, specially assigned) and RAYMOND G. THIEME, JR., (retired, specially assigned), JJ.

MOYLAN, J.

On December 8, 2005, a fragmented Court of Appeals significantly expanded the coverage of the Rule Against Hearsay in Maryland with its opinions in *Stoddard v. State,* 389 Md. 681, 887 A.2d 564, and *Bernadyn v. State,* 390 Md. 1, 887 A.2d 602. Several categories of verbal conduct that had theretofore been considered non-hearsay were brought within the expanded definition of "implied assertions" and, thereby, came under the potential exclusionary ban of the Rule Against Hearsay. The present case poses the question of whether yet another traditional category of non-hearsay, frequently referred to as "verbal parts of acts" and represented in this case by incoming telephone calls to gambling parlors or to sellers of narcotics, will also be swept away by the strong undertow of *Stoddard* and *Bernadyn,* or whether the expansionist tide that produced those opinions is actually on the ebb.

### The Present Case

The appellant, Alphonso Garner, was convicted by a Queen Anne's County jury, presided over by Judge John W. Sause, Jr., of the possession of cocaine with the intent to distribute, of driving on a revoked license, and of other related offenses that were merged for sentencing. On this appeal, the appellant raises the three contentions

1. that Judge Sause erroneously failed to comply with Maryland Rule 4–215 before allowing the appellant to waive his right to counsel,

2. that Judge Sause erroneously admitted inadmissible hearsay evidence, and

3. that Judge Sause's improper comment deprived the appellant of his right to a fair trial.

### Factual Background

The appellant does not challenge the legal sufficiency of the State's evidence to prove his guilt generally. The only small residuum of controversy was his effort to convince the jury that he was only a user of drugs and not a pusher.

At 3:45 in the afternoon on June 22, 2006, Trooper Jeremy Gussoni of the Maryland State Police and Scott Myers, a State Police Academy candidate, stopped the appellant, who was driving on U.S. Route 301 in Queen Anne's County, for no less than three minor traffic infractions. As they approached the appellant's stopped car, they heard him yell into a cell phone that he had been "profiled." The appellant immediately handed Trooper Gussoni an identification card and volunteered that his driver's license had been suspended. Trooper Gussoni verified the fact that the driver's license had been revoked. Trooper William Heath arrived on the scene and arrested the appellant for driving on a revoked license. A search incident to the appellant's arrest revealed 13 individually wrapped baggies containing what turned out to be cocaine "secreted in the vehicle's glove box, inside a fuse box." The aggregate weight of the cocaine was 6.9 grams.

On the way to the police station, the appellant asked, "What's going to happen next?" Trooper Gussoni replied that the baggies were going to be fingerprinted. The appellant then said, "You don't have to do that. That shit is mine." When Trooper Gussoni said, "I hope you don't use cocaine; that ... ruins your heart, your brain," the appellant replied, "I don't do that stupid stuff, I only do it every now and again." Taken from the appellant at the police station was his cell phone.

At trial, the appellant called his girlfriend as a witness. She testified that the appellant had a cocaine problem and that she had sometimes seen him "eating" cocaine. Corporal Aaron Michael testified as an expert witness and testified that he had never heard of anyone eating cocaine. He further testified that each of the 13 rocks of cocaine seized from the appellant had a street value of between $40 and $60. Trooper Gussoni had testified that when the appellant's cell phone rang at the station house, Gussoni answered it and said, "Hello." The caller asked, "Can I get a 40?" but then hung up when Gussoni asked him for his name. Trooper Michael explained that the term "40" is a "common reference" for four-tenths of a gram of crack cocaine. It was Trooper Michael's expert opinion

that the 13 baggies of cocaine taken from the appellant were intended for sale.

## The Minefield of Rule 4–215

■ Before we can take up the evidentiary matter that is the marquee issue of this appeal, we must get across an ugly patch of difficult terrain. For a judge to traverse Rule 4–215 is to walk through a minefield. A miracle might bring one across unscathed. For mere mortals, the course will seldom be survived. The appellant's first contention is that Judge Sause failed to comply with the provisions of Rule 4–215(e) when he "allowed [the appellant] to waive his right to counsel" immediately before the trial began. Rule 4–215(e) provides:

> (e) Discharge of Counsel—Waiver. If a defendant requests permission to discharge an attorney whose appearance has been entered, the court shall permit the defendant to explain the reasons for the request. If the court finds that there is a meritorious reason for the defendant's request, the court shall permit the discharge of counsel; continue the action if necessary; and advise the defendant that if new counsel does not enter an appearance by the next scheduled trial date, the action will proceed to trial with the defendant unrepresented by counsel. If the court finds no meritorious reason for the defendant's request, the court may not permit the discharge of counsel without first informing the defendant that the trial will proceed as scheduled with the defendant unrepresented by counsel if the defendant discharges counsel and does not have new counsel. *If the court permits the defendant to discharge counsel, it shall comply with subsections (a)(1)-(4) of this Rule* if the docket or file does not reflect prior compliance.

(Emphasis supplied).

Operating on the assumption that the appellant had been permitted to discharge his counsel, the appellant contends that compliance with subsection (a)(3) then requires that the trial judge:

(3) advise the defendant of the nature of the charges in the charging document, and the allowable penalties, including mandatory penalties, if any.

In this case, the appellant was charged by a criminal information filed by the State's Attorney for Queen Anne's County on August 3, 2006. The flagship count was the possession of cocaine with the intent to distribute. The initial appearance of the appellant was set for August 25, 2006, but the summons was "not served." Judge Thomas G. Ross issued a bench warrant for the appellant. It was served on the appellant on September 7, 2006. On September 8, the appellant appeared, without counsel, for a bail review and initial appearance hearing. Judge Ross advised the appellant of the allowable penalties as follows:

THE COURT: So you understand that you are charged with possession of a controlled dangerous substance, not marijuana; that carries four years in prison $25,000 fine or both. *Charged with possession with intent to distribute controlled dangerous substance, not marijuana; that carries 20 years in prison, $25,000 fine or both.* You're charged with possession of paraphernalia; that's a fine only, unless subsequent offender papers are filed. That carries a $500 fine. Charged with distributing paraphernalia. Let me see about that. That carries a $500 fine. You are charged as well, in Count 5 with driving without a license; carries a $500 fine in this court. You are charged with violation of Transportation Article 16–303(c) driving on a suspended license; that carries a year in jail, $1,000 fine or both.

Charged in the seventh count with driving on a revoked license and privilege; carries a year in jail, $1,000 fine or both. You are charged in Count 8 with a violation of 303(h) of the Transportation Article which is driving a motor vehicle while suspended under certain provisions of the Transportation Article. That carries 60 days in jail, $500 fine or both. You are charged with throwing, dumping, discharge, deposit of refuse on a public highway, carries $500 fine in this court. Charged with driving with an

obstructed windshield view which carries a $500 fine in this court.

Okay. I've advise you of the nature of the charges, the range of allowable penalties.

(Emphasis supplied).

 The advice as to the allowable sentence for a conviction of possessing cocaine with the intent to distribute was meticulously correct for a first offense on that charge. The "kicker" was that the appellant was apparently a fourth-time offender and was subject to a sentence, pursuant to Criminal Law Article, § 5–608(d), of "not less than 40 years." With respect to the required advice under that circumstance, the unforgiving command of *Knox v. State*, 404 Md. 76, 88, 945 A.2d 638, is clear:

> *We hold that "allowable penalties*, including mandatory penalties, if any," as stated in Rule 4–215, *includes notice of subsequent offender penalties* .... Absent information as to mandatory or *enhanced penalties*, it *could hardly be said that a defendant makes a knowing* and voluntary *decision to waive [or to discharge] counsel* with eyes open or with full knowledge of the ramifications of the choice.

(Emphasis supplied). In this case, no advice was given with respect to the "mandatory or enhanced penalties" for a subsequent offender.[1]

---

**1.** It would seem harsh, were we required to do so, to hold that a judge was in error for failing to anticipate *Knox v. State*, which was only filed on March 20, 2008. The advice as to the possible penalties in this case was given on September 8, 2006, eighteen months before the *Knox* opinion was filed. The trial in this case concluded with sentencing on May 11, 2007, ten months before the *Knox* opinion was filed. As *Knox* itself acknowledged, its holding was by no means foreordained.

> *Rule 4–215 does not mention enhanced* or mandatory *penalties based upon subsequent offender status* .... *The omission of the subject reasonably could suggest that the legislative intent was to treat subsequent offender penalties separately from the general advice provision* of Rule 4–215. In contrast, the general language of Rule 4–215 may be read as inclusive of subsequent offender penalties because it uses broad, unlimited language. *We conclude that* ... *Rule 4–215 is ambiguous.*

404 Md. at 86, 945 A.2d 638 (emphasis supplied).

## Counsel Was Not Discharged

The saving grace is that the triggering event for the imposition of Rule 4–215(a)(3) never came to pass. The activating clause in subsection (e) is:

*If this court permits the defendant to discharge counsel,* it shall comply with subsections (a)(1)-(4) of this Rule.

(Emphasis supplied). In this case, the trigger was never pulled. Counsel was never actually discharged. The minefield, though it could have been fatal, never actually had to be traversed.

Curt Anderson, Esq. was engaged as privately retained counsel on October 10, 2006. A pretrial conference was scheduled for October 20, 2006, but was "vacated" by mutual consent. Also by consent of the parties, the trial was postponed from November 29 to November 30, 2006. As of the morning of trial, however, trouble was in the air. Apparently Mr. Anderson's appraisal of the case was that the appellant's chances of acquittal were virtually non-existent, that the potential sentence the appellant was facing was heavy, and that the appellant's only feasible strategy was to make the best deal possible for himself. The appellant, on the other hand, was not inclined to deal. Judge Sause assured the appellant that he did not have to agree to a plea.

MR. ANDERSON: Your Honor, as you can imagine, this is a very serious case with the State intending to pull a mandatory 25[on] Mr. Garner is—well—

[PROSECUTOR]: Potential.

MR. ANDERSON: Potential, the mandatory for Mr. Garner, if proceeded to trial. For the last couple of days, *I've explained to Mr. Garner the nature of the case, the evidence against him.* In other words, *things that a lawyer does prior to* trial and *I had recommended to Mr. Garner a certain disposition* in this case, *as opposed to going to trial* and I have, apparently, done too consistently because Mr. Garner has indicated to me that he doesn't think that I have his best interests at heart with regard to this case. *He doesn't think I'm going to try the case wholeheartedly*

*because of my continued assertions that he take a plea in the case.* Again, the only reason why I have suggested that to him—not the only reason—it's sometimes what I do prior to cases when I think the State—after my assessment of the State's case. So I thought I ought to bring that to the Court's attention because I think he was going to stand up and say it, but I thought, perhaps, at a bench conference it might be better.

THE COURT: Oh, yeah, I quite agree with that. Mr. Garner, you heard what Mr. Anderson said, do you want to add anything to that?

THE DEFENDANT: Yes, sir. *I feel like he's not going to represent me in my best interest.*

THE COURT: Why didn't you do something about it before now?

THE DEFENDANT: Because I thought he was going to try to represent me in my best interests, but after a couple days, I done seen that he's not trying to—

MR. ANDERSON: But I told you, I showed you—

THE DEFENDANT:—and I'm not trying to take a plea. *He is trying to force a plea, make me take a plea that I don't want to take.*

THE COURT: *Well, you don't have to take a plea. I'm not going to make you take a plea.*

THE DEFENDANT: I don't feel that he don't want to represent me with my best interests with the case that's at hand.

THE COURT: Well, then you should have done something about it before.

(Emphasis supplied).

The attorney-client relationship that at one point was perilously hanging on the ropes then appeared to catch a second wind.

THE COURT: [Y]ou chose the attorney. If you had problems, you had to work it out with him. Mr. Anderson is a member of the bar, I'm sure if you told him what your

feelings were, I'm sure he would have done something about it.

THE DEFENDANT: I have told him.

THE COURT: What?

THE DEFENDANT: *He can sit there.*

THE COURT: *What?*

THE DEFENDANT: *He can sit there.*

THE COURT: *Okay. Thank you. Go ahead.*

(Emphasis supplied).

At that point, to be sure, the status of the attorney-client relationship was still perilously ambiguous, but it gathered strength as the trial progressed. The appellant's only expressed dissatisfaction with Anderson initially had been over the issue of whether to proceed with a full-blown trial on the merits or to enter a guilty plea. Once that question was resolved as the appellant wished it to be, there was no indication of any further strategic disagreement between attorney and client. The bottom line is that Anderson was never discharged as counsel for the appellant and that the provisions of Rule 4–215(a)(3), therefore, never came into play.

Our concern, and the concern of Rule 4–215, is with the fundamental right of a defendant to have the effective assistance of counsel when going to trial in a criminal case. That basic purpose was well expressed by Judge Orth in *Parren v. State,* 309 Md. 260, 281–82, 523 A.2d 597 (1987):

It is perfectly clear that *the purpose of Rule 4–215 is to protect that* most important *fundamental right to the effective assistance of counsel,* which is basic to our adversary system of criminal justice, and which is guaranteed by the federal and Maryland constitutions to every defendant in all criminal prosecutions.

(Emphasis supplied).

As we assess whether the appellant received that constitutionally guaranteed effective assistance of counsel, we will look to what actually took place at the appellant's trial and not at what looked as if it might take place in the waning moments

before the trial began. Although the colloquy at that time was a bit vague, there loomed at least the possibility that Anderson might be discharged and might remain available only in a stand-by capacity by way of giving legal advice if such advice were to be sought by the *pro se* defendant. In fact, no such watered down relationship ever asserted itself.

Mr. Anderson professionally and ably conducted the complete defense of this case from start to finish. He conducted the voir dire examination of the prospective jurors and then selected the jury. He made a motion in limine. He delivered the opening statement. He cross-examined the State's witnesses and made objections. He called the appellant's girlfriend as a defense witness. He made motions, at the end of the State's case and at the end of the entire case, for a judgment of acquittal. He delivered a closing argument. He referred to the appellant as "my client." The State referred to him as "counsel": "Your Honor, I'm going to file the additional penalties I previously served on counsel, subsequent offender notice." He represented the appellant at sentencing. He filed and argued a new trial motion. Indeed, at that hearing on the motion for a new trial, Judge Sause noted:

I'm delighted to see that there has apparently been a rapprochement. As I pointed out before, *Mr. Anderson participated to his usual able way throughout the trial.*

(Emphasis supplied).

From the opening gavel through the conclusion of the motion for a new trial, there was never the remotest indication that Mr. Anderson was not full-fledged counsel for the defense. The appellant himself did not actively participate in the conduct of his trial in any way nor did he protest his passive role. This was in no respect the "hybrid representation" described by *Parren v. State,* 309 Md. at 264, 523 A.2d 597:

Hybrid representation is apparently considered to encompass both the participation of the defendant in the conduct of his trial when he had not effectively waived the assistance of an attorney to defend him, and the participation by an

attorney in the conduct of the trial when the defendant was defending *pro se.*

In this case, it was Mr. Anderson and not the appellant who "called the shots" from start to finish. Judge Orth described the difference in roles.

> *When a defendant appears pro se, it is he who calls the shots,* albeit, *perhaps, with the aid, advice and allocution of counsel* in the discretion of the trial judge. *When a defendant is represented by counsel, it is counsel who is in charge of the defense* and his say as to strategy and tactics is generally controlling, but again with such participation by the defendant as the trial judge deems appropriate.

309 Md. at 265, 523 A.2d 597 (emphasis supplied). In the last analysis, the potential Rule 4–215 problem turns out to have been a non-starter. The minefield was finessed.

### When Is an Out–of–Court Utterance Non–Hearsay?

■ That brings us to the fascinating evidentiary issue which is the main feature of this appeal. At the police station following his arrest, the appellant was relieved of his cell phone. When the cell phone rang, Trooper Gussoni answered it by saying, "Hello." A male caller inquired, "Can I get a 40?" but then hung up when Trooper Gussoni asked him his name. Trooper Gussoni actually described the phone as "ringing non-stop." "Again, it was just continually ringing, ringing." Although this brief telephone exchange added little, if anything, to the proof of the appellant's guilt as a possessor, it clearly helped to characterize that possession as commercial in nature and not as simple possession for personal use. The defense moved in limine to have the content of the call excluded from evidence.

> Obviously, it's an anonymous call. We don't know who it was from, we don't know if they got the right number and *I'm not able, obviously, to cross-examine. I think the reliability of whatever was said on the other end is subject to suspicion* and I think the probative value of that would certainly not outweigh the prejudice that it would weigh on

my client in this particular case. The person on the other end said something about do you have—do you have a 40. (Emphasis supplied).

The motion in limine was denied and the State did not hesitate, in opening statement, to characterize the call as precisely the thing it was.

He [had] a cell phone that he was actually talking on immediately when Trooper Gussoni stopped him and his phone kept ringing at the barrack. Eventually, Trooper Gussoni picked it up and *the person on the other end of the phone* asked him—*said he needed a 40.* I think you'll hear from Corporal Michael *a 40 is slang for a $40 piece of cocaine.*

(Emphasis supplied).

In closing argument, the State again referred to the phone call as proving precisely the thing that it validly served to prove, to wit, that the appellant was a pusher and not a mere user.

There are lots of factors for distribution. Very few factors for possession in this case. I mean, not possession—personal, mere use. Very little actually, nothing for mere use because there's nothing to use it with. But I keep coming back, I know I said this before, you do not, *you do not ca[ll] a user a mere user of cocaine and ask him for a 40.* As Corporal Michael tells you, crack cocaine, the language on it is a 20, a 40, a 60, a 80, 100. A 40 is a $40 piece of crack cocaine. Once you do the math, which I did. 6.9 divided by 12, is .53. I don't know if they're all .53. Some could be .4, some could be .6, but we're in that range, between a 40 and a 60, on the average. *That's what he's got. Call this guy's phone,* the phone is blowing up. *Phone is going crazy, Trooper Gussoni* probably *answers it,* maybe it's his girlfriend, *yes, I need a 40. That's a pretty big factor.*

(Emphasis supplied).

To be admissible, evidence must be competent, relevant, and material. The evidence of the phone call in this case was self-evidently relevant and material. What remains to be

tested is its competence. That will depend upon whether it is or is not hearsay. The basic rule, most aptly described as the Rule Against Hearsay,[2] is set out in Maryland Rule of Procedure 5–802.

> Except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, *hearsay is not admissible.*

(Emphasis supplied). Rule 5–801, in turn, gives us the necessary definitions to go to work on the problem.

> (a) Statement. *A "statement" is* (1) *an oral* or written *assertion* or (2) nonverbal conduct of a person, *if it is intended by the person as an assertion.*

> (b) Declarant. A "declarant" is a person who makes a statement.

> (c) Hearsay. *"Hearsay" is a statement,* other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted.*

(Emphasis supplied).

Federal Rule of Evidence 801(c), from which the Maryland Rule was derived, is absolutely verbatim with the Maryland definition. The Advisory Committee note to Federal Rule 801(c) states:

> The effect of the definition of "statement" is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion. *The key to the definition is that nothing is an assertion unless intended to be one.*

In *Ali v. State,* 314 Md. 295, 304, 550 A.2d 925 (1988), Judge McAuliffe gave the classic common law definition of hearsay:

---

**2.** In *Cassidy v. State,* 74 Md.App. 1, 7–8, 536 A.2d 666 (1988), this Court explained:

> The full name of the rule is *The Rule Against Hearsay.* Although subject to multitudinous exceptions, the Rule, in its essence, is a rule of exclusion.... The opponent of hearsay does not have to show why it should be rejected. The fact that it is hearsay is, presumptively, reason enough.

*Hearsay* is generally defined as *a statement,* other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted.* Thus, when a statement is offered for some purpose other than to prove the truth of the matter asserted therein, it is not hearsay.

(Emphasis supplied).

Before moving out to the disputed borderland [3] of hearsay and non-hearsay, it is helpful to have a firm grasp of the hearsay center. In *Stoddard v. State,* 157 Md.App. 247, 257, 850 A.2d 406 (2004), reversed on other grounds, 389 Md. 681, 887 A.2d 564 (2005), this Court described the starting point for analyzing what is an assertion.

> *At the most basic level,* under both the common law and the new Federal and Maryland Rules, *a hearsay statement consisted* routinely *of the speaking of a declarative sentence in the indicative mood, which sentence stated the very fact which the proponent of the statement sought to prove by its use.* Early on, however, it was recognized that a hearsay statement could be a writing of an assertion as well as a speaking of it. It was also universally recognized, virtually *ab origine,* that *a hearsay statement could consist of a non-verbal action if the action were intended by the actor to be an assertion.* The pointing of a finger at Suspect # 4 is just as assertive as are the words, "The man who robbed me is Suspect # 4." Just as surely assertive, in response to a question, is a vertical shaking of the head ("Yes"), a horizontal shaking of the head ("No"), or a shrug of the shoulders ("I don't know").

(Emphasis supplied).

In *Holland v. State,* 122 Md.App. 532, 543–44, 713 A.2d 364 (1998), we further explored how an assertion ordinarily does not embrace questions and commands.

---

**3.** An excellent overview and a good starting point for analysis is Charles McCormick, "The Borderland of Hearsay," 39 *Yale L.J.* 489 (1930).

*To qualify as hearsay, the words recounted* in court *must,* for starters, *constitute an assertion or statement of a fact.* Many out-of-court utterances are self-evidently not assertions. If a witness testifies to the out-of-court inquiry, "What time is it", that inquiry is obviously not an assertion of anything. *For an out-of-court utterance to qualify as an assertion, it generally must be in the indicative or declarative mood, rather than in the interrogative mood, the imperative mood, or the subjunctive mood.* An out-of-court assertion of a fact may be true or untrue. For that reason, its admissibility in evidence is problematic if offered to prove that fact. *An out-of-court inquiry, "What time is it?" can be, by its very nature, neither true nor untrue* and there is, therefore, no such credibility problem. *The out-of-court command, "Stop!" can be, by its very nature, neither true nor untrue* and there is, therefore, no such credibility problem.

(Emphasis supplied).

In *Burgess v. State,* 89 Md.App. 522, 537–38, 598 A.2d 830 (1991), Judge Alpert quoted with approval from D. Binder, *Hearsay Handbook* (3d ed.1991) 18:

*Many out-of-court utterances fall within such categories as greetings, pleasantries, expressions of gratitude, courtesies, questions, offers, instructions, warnings, exclamations, expressions of joy, annoyance, or other emotion,* etc. *Such utterances are not intended expressions of fact* or opinion. *They are not assertions,* at least for purposes of the hearsay rule. *Thus they are not hearsay.*

"Hello."

"How are you?"

"Have a nice day."

"Would you like to have lunch?"

"I hope it doesn't rain tomorrow."

"I wonder what he paid for that car."

"Thank you."

"Can you join me for a drink?"

"Don't do that, or else."

"Watch your step."

*None of the above utterances is an intended expression of fact or opinion. None is hearsay.*

(Emphasis supplied). And see *United States v. Oguns,* 921 F.2d 442, 448–49 (2d Cir.1990) (an inquiry is not an assertion); *United States v. Long,* 905 F.2d 1572, 1579–80 (D.C.Cir.1990) (questions are non-assertive).

In *Carlton v. State,* 111 Md.App. 436, 443, 681 A.2d 1181 (1996), Judge Salmon explained how even a question can sometimes qualify as an assertion within the contemplation of the Rule Against Hearsay, although, generally speaking, it would not so qualify.

> Many questions asked by an out-of-court declarant can be implied assertions. For example, the question, "Do you need change?" impliedly asserts that the questioner has change. *State v. Saunders,* 23 Ohio App.3d 69, 491 N.E.2d 313 (1984). The question, "Why did you stab me, Brutus?" impliedly asserts that the questioner was stabbed by Brutus. On the other hand, *many, if not most, questions make no assertion; the questioner simply seeks answers. Burgess v. State,* 89 Md.App. 522, 537–38, 598 A.2d 830 (1991).

(Emphasis supplied).

In *Carlton,* the defendant was convicted of felony murder and armed robbery. In issue was the admissibility of several questions addressed by a co-defendant to a neighbor of the victim. One was whether the victim had an alarm. Another was at what time would the victim normally leave his place of employment. The defendant objected to their admissibility on the ground that the questions constituted hearsay. This Court held that the utterances were not hearsay.

> *Ussel's questions could not possibly have been "offered in evidence to prove the truth of the matter asserted."* Therefore, the hearsay rule was not violated when Ms. Shipley was allowed to repeat the questions Ussel asked her.

111 Md.App. at 443, 681 A.2d 1181 (emphasis supplied).

Joseph F. Murphy, Jr., *Maryland Evidence Handbook* (3d ed.1999), § 702(B), 261, characterizes the non-assertive ques-

tions in the *Carlton* case as non-hearsay and, therefore, as admissible circumstantial evidence.

> *Courtney* is precedent for the admission of "implied assertions," and *correctly treats nonassertive conduct as circumstantial evidence of a material fact.*

(Emphasis supplied).

Lynn McLain, *Maryland Evidence* (2d ed.2001), § 801:4, pp. 39–40, also placed her seal of approval on our discussion in *Carlton v. State* of the hearsay issue.

In affirming the conviction, a panel of the Court of Special Appeals, in a well-reasoned opinion by Judge Salmon, found that *the defendant was not intentionally making an implied assertion*, nor was the evidence offered to prove such an implied assertion. Therefore, *the evidence was not hearsay*.

(Emphasis supplied). The evidence, as non-hearsay, was circumstantial evidence of guilt.

### Telephone Calls to a Bookie or a Supplier of Drugs

It is a not infrequent occurrence that the police, after making arrests at a bookmaking parlor or a gambling den or a place where drugs are sold, will pick up a ringing telephone and field the call. The making of a wager or the purchase of a drug, legally or illegally, is a form of contract. *Little v. State*, 204 Md. 518, 522–23, 105 A.2d 501 (1954). There is an offer and an acceptance. The telephoned words of the would-be bettor or would-be purchaser are frequently categorized, therefore, as verbal parts of acts. They are not considered to be assertions and do not fall under the scrutiny of the Rule Against Hearsay. Sometimes, however, the categorization traveled under the now discredited label of res gestae. See *Cassidy v. State*, 74 Md.App. 1, 12–14, 536 A.2d 666 (1988). (It was only the academic rationale that has been discredited, not the admissibility *per se* of the telephoned utterances.)

In John Strong, *McCormick on Evidence* (4th ed.1992), § 249, "Some Out–of–Court Utterances Which Are Not Hear-

say," under the subhead "Verbal parts of acts," p. 102, appears the following:

Similar considerations are commonly said to prevail when the character of an establishment is sought to be proved by evidence of statements made in connection with activities taking place on the premises.[7]

7. Numerous cases involve prosecutions for conducting a gambling establishment, often those accepting bets on horse races. *If a person, while handing over money says, "here's $100. on Thunderer to show in the fourth," the words would qualify as the verbal part of an act, i.e. the act of betting.* In some of the cases, *police who were on the premises during a raid, answered incoming telephone calls* by persons saying they wished to place specified bets. *These phone calls have been classed as verbal acts.*

(Emphasis supplied). Joseph F. Murphy, Jr., *Maryland Evidence Handbook* (3d ed.1999), § 702(A), 260, similarly classifies these cases as instances of "Verbal Acts or Verbal Parts of an Act."

In Maryland the contents of such calls have historically been held to be admissible evidence. In *Courtney v. State*, 187 Md. 1, 48 A.2d 430 (1946), the police raided a bookmaking parlor and one of the officers answered the ringing telephones. Over "the period of an hour various persons calling from places unknown placed $85 in bets with him." 187 Md. at 3, 48 A.2d 430. The contents of the calls were held to be admissible.

[T]he evidence, as we have seen, was offered to show that the place in question was a gambling place and that some or all of the persons found therein were engaged in taking bets in violation of law. For these purposes it was proper.

187 Md. at 6, 48 A.2d 430. See also *Alexander v. State*, 198 Md. 395, 397, 84 A.2d 98 (1951); *White v. State*, 204 Md. 442, 104 A.2d 810 (1954).

In *Best v. State*, 71 Md.App. 422, 526 A.2d 75 (1987), the incoming telephone call fielded by the police in the course of executing a search warrant was for the purpose of purchasing a narcotic drug. We noted initially:

*[I]t would be unreasonable to require police officers* executing a search and seizure warrant, once lawfully on the

premises to be searched, *to ignore the ringing of a telephone* or a knock at the door.

71 Md.App. at 432, 526 A.2d 75 (emphasis supplied).

Judge Karwacki's explanation in *Best* of why the content of the incoming call was non-hearsay remains the definitive analysis.

> *"Hearsay may be defined as an out-of-court assertion offered in court for the truth of the matter asserted,* resting for its value upon the credibility of the out-of-court asserter." *Ali v. State,* 67 Md.App. 339, 343, 507 A.2d 648 (1986). *Detective Eller's testimony concerning his conversation with Debbie from Delaware was not offered in court for the truth of what Debbie,* the out-of-court asserter, *said;* rather, it was offered as evidence of the fact that the call was made. As such, *Detective Eller's testimony was not hearsay at all, but evidence of a verbal act. United States v. Hansbrough,* 450 F.2d 328, 329 (5th Cir.1971). *Testimony concerning telephone calls made to or received at a particular location has been held admissible frequently in prosecutions for bookmaking and other gambling activities,* where such testimony is offered not to establish the truth of what was said over the telephone, but as evidence that the calls were made to the location for the purpose of placing bets. Analogously, Detective Eller's testimony about the phone call in this case was offered as evidence that the call was made for the purpose of arranging an illegal drug transaction. The trial court did not err in admitting Detective Eller's testimony.

*Id.* (emphasis supplied). Nothing in either *Stoddard,* 389 Md. 681, 887 A.2d 564 or *Bernadyn,* 390 Md. 1, 887 A.2d 602 expressly casts any doubt on the continuing vitality of Judge Karwacki's reasoning in *Best.* We also find the painstaking analysis in *United States v. Zenni,* 492 F.Supp. 464 (E.D.Ky. 1980), to be very persuasive. In the course of a warranted search for evidence of bookmaking, the government agents "answered the telephone several times." The unknown caller "stated directions for the placing of bets on various sporting events." 492 F.Supp. at 465. After an extensive analysis of

the hearsay issue involved, the District Court ruled that the contents of the phone calls were not intended to be assertions and, therefore, did not satisfy the definition of hearsay evidence.

Applying the principles discussed above to the case at bar, this court holds that *the utterances of the bettors telephoning in their bets were nonassertive verbal conduct,* offered as relevant for an implied assertion to be inferred from them, namely that bets could be placed at the premises being telephoned. The language is not an assertion on its face, and *it is obvious these persons did not intend to make an assertion about the fact sought to be proved or anything else.*

492 F.Supp. at 469 (emphasis supplied). See also *United States v. Perez,* 658 F.2d 654, 659 (9th Cir.1981); *United States v. Jackson,* 588 F.2d 1046, 1049 n. 4 (5th Cir.1979).

In *United States v. Long,* 905 F.2d 1572 (D.C.Cir.1990), a warranted search of a premises for narcotics was in process when the police answered a telephone call. The caller wanted to know whether Keith (the defendant) "still had any stuff." When the officer sought clarification, the caller explained that she was asking about "a fifty." The defendant Long objected to the admissibility of the contents of the call on the ground that it was an implied assertion that the defendant had narcotics for sale. The Circuit Court of Appeals for the District of Columbia rejected the challenge on the basis that it was not an assertion.

Although the rule does not define "assertion," the accompanying advisory committee note stresses that *"nothing is an assertion unless intended to be one."*

*The caller's words, thus, cannot be characterized as an "assertion," even an implied one, unless the caller intended to make such an "assertion."* ... *[T]he crucial distinction* under rule 801 *is between intentional and unintentional messages,* regardless of whether they are express or implied. *It is difficult to imagine any question or for that*

*matter any act, that does not in some way convey an implicit message.*

905 F.2d at 1579–80 (emphasis supplied).

The D.C. Circuit made it very clear that the mere fact that the call could serve as the predicate for a damaging inference does not make it an intentional assertion.

With our inquiry focused on the *intent* of the caller, we have little trouble disposing of Long's theory about implied assertions.... *The caller may indeed have conveyed messages about Long through her questions, but any such messages were merely incidental and not intentional. Because the caller's questions were nonassertive, they fall outside the scope of the hearsay rule,* and the trial judge did not err in admitting the testimony concerning the questions.

*Id.* at 1580 (emphasis supplied).

*United States v. Lewis,* 902 F.2d 1176 (5th Cir.1990), also involved a telephone call, but one with an added dimension. The police arrested the defendant Lewis as a narcotics pusher and seized from him a pager or beeper. When the pager began beeping, the police called the number displayed on it. The person on the other end of the line picked up the phone and asked, "Did you get the stuff?" The defendant interposed a hearsay objection, which the Fifth Circuit rejected:

*The questions* asked by the unknown caller, *like most questions* and inquiries, *are not hearsay because they do not,* and were not intended, to *assert anything.*

902 F.2d at 1179 (emphasis supplied).

The Fifth Circuit went on to explain why implied assertions do not qualify as "statements" within the contemplation of the Rule Against Hearsay as that rule is now almost universally defined.

Appellants argue that while the questions in this case are not direct assertions, there are certain assertions implicit in the questions. For example, they argue that implicit in the question "Did you get the stuff?" is an assertion that Lewis and/or Wade were expecting to receive some "stuff." How-

ever, *Rule 801, through its definition of "statement," fore-closes appellants' argument by removing implied assertions from the coverage of the hearsay rule.*

*Id.* (emphasis supplied).

As these federal circuit court decisions illustrate, the danger of a sweepingly broad definition of "implied assertion" is that virtually every utterance can arguably be deemed to be an implied assertion of the thing it is offered to prove, no matter how attenuated the string of inferences. Without some constraint on the process, there could be virtually nothing left to the very concept of non-hearsay. The utterance, after all, would not be offered if it were not offered to prove something. In a sense, any piece of evidence "implies" the thing it is offered to prove, lest it be deemed irrelevant. That is why the participle "implied" is such a treacherous term. Any doctrinal discipline, if it is to exist, must be found in the noun "assertion." A careful and insistent application of the term "assertion" is an indispensable antidote to the promiscuous explosion of the Rule Against Hearsay.

## The Reach and the Future of *Stoddard* and *Bernadyn*

In arguing that the anonymous telephone caller's question, "Can I get a 40?" was an implied assertion that the appellant was a seller of cocaine and that it, therefore, fell under the ban of the Rule Against Hearsay, the appellant, of necessity, relies upon a broad reading of the Court of Appeals opinions in *Stoddard* and *Bernadyn*. The appellant's tactic is an astute one. It also pinpoints for us the precise point on which our decision must pivot one way or the other.

If we give *Stoddard* and *Bernadyn* the broad and expansive reading urged by the appellant, the untethered sweep of "implied assertions" could easily embrace the anonymous caller's question in this case. Indeed, a large part of the pre-*Stoddard* and pre-*Bernadyn* constraint on the excessive over-use of the Rule Against Hearsay was the requirement that the out-of-court declaration actually be an assertion. A broad definition of implied assertion, however, as any utterance that can be used by its proponent to prove anything effectively

excises the word "assertion" out of every definition of hearsay. It brings into play the very looseness of language (and of thought) that we cautioned against in our *Stoddard v. State,* 157 Md.App. at 273 n. 12, 850 A.2d 406.

The problem, of course, is that the phrase "implied assertion," in widespread use for 150 years, had nothing to do with an action's or an utterance's being assertive. It was simply a poor choice of words to connote the capacity of the action or the utterance to be, circumstantially, the trigger for an inference. The sophisticated may be comfortable with it, but *the very idea of a non-assertive assertion* is going to continue to trip a lot of people up.

(Emphasis supplied).

If, on the other hand, we read the decisions in *Stoddard* and *Bernadyn* conservatively and as carefully confined to the situations before the Court on those occasions, we would not hesitate to hold the brief telephoned inquiry in this case was non-hearsay and, therefore, admissible. *Stoddard* and *Bernadyn* were not dealing with that variety of non-hearsay frequently described by the academic commentators as "verbal parts of acts." *Stoddard* and *Bernadyn* did not overrule, or even mention, for example, Judge Karwacki's decision in *Best v. State* or the impressive body of nationwide caselaw represented by *Best v. State.*

Although we would not normally presume to undertake such an assessment, the pivotal decision of which way to turn in this case leaves us no choice but to attempt to diagnose the relative vitality or fragility of *Stoddard* and *Bernadyn.*

### *Fields v. State:* A Harbinger of Retreat

Almost four months after *Stoddard* and *Bernadyn* were decided, this Court filed its opinion in *Fields v. State,* 168 Md.App. 22, 895 A.2d 339 (2006). The appellant there was convicted of one count of first-degree murder and two counts of first-degree assault. The evidence showed that Fields had engaged in a shooting spree just outside a bowling alley. His defense "was that he was not the shooter and was not even

present at the bowling alley when the shootings happened." 168 Md. at 28, 176 A. 474.

A key item of State's evidence helped to prove that Fields was, indeed, at the bowling alley on the night of the shootings. There was a television monitor at each bowling lane. The names and scores of the bowlers at that lane were displayed on a screen. One of the three names on the screen above Lane 22 was "Sat Dogg." Other evidence established that Fields's nickname was "Sat Dogg."

The defense contention before the trial court was that the writing of the name "Sat Dogg" was hearsay because it was an implied assertion of the fact that Sat Dogg was present at the bowling alley that night.

> Immediately before the start of trial, the defense moved *in limine* to preclude the State from eliciting testimony from Detective Canales that the name "Sat Dogg" appeared on a television screen in the bowling alley or introducing into evidence the detective's handwritten list showing that the name "Sat Dogg" appeared on the television screen at bowling lane 22. *Defense counsel argued that the evidence was hearsay. Specifically, she maintained that the name* "Sat Dogg" on the screen *was an implied assertion,* by an unknown declarant, made out of court, *that the appellant was present in the bowling alley that night; and the State was offering the implied assertion in evidence to show its truth.* Because the evidence did not fall within any exception to the rule against hearsay, it was inadmissible.

168 Md.App. at 29, 895 A.2d 339 (emphasis supplied). The trial judge denied the motion, ruling that there was no reason to think that the writer of the name intended it to be "an assertion that the appellant was present at that location." *Id.* at 30, 895 A.2d 339. Fields was convicted of all three crimes.

The procedural history of the *Fields* appeal provides insight into some arguable restiveness within the Court of Appeals about *Stoddard* and *Bernadyn.* An unreported opinion of this Court, authored by Judge Deborah Eyler, had initially affirmed Fields's conviction. It was filed on May 25, 2005. One

of the contentions was the hearsay issue. This Court rejected it. On December 8, 2005, the Court of Appeals filed its decisions in *Stoddard* and *Bernadyn.* On January 11, 2006, the Court of Appeals vacated the decision of this Court in the *Fields* case and remanded the case to us for reconsideration in light of *Bernadyn.* In our published opinion of March 30, 2006, Judge Eyler reaffirmed our earlier position.

We have reconsidered our decision in light of the Court of Appeals's decision in *Bernadyn,* and shall affirm the judgments of the circuit court.

168 Md.App. at 26, 895 A.2d 339.

Our opinion acknowledged that, under *Stoddard,* the ruling of the trial judge that the writing was not hearsay because it was not intended to be an assertion could no longer be sustained.

*[T]he reason the trial judge gave for concluding that the evidence* that the appellant's nickname was on a television screen in the bowling alley *was non-hearsay was incorrect, under Stoddard.* The trial judge determined that the person who entered the name "Sat Dogg" on the screen did not intend to assert that the appellant was present in the bowling alley. If the words "Sat Dogg" were an implied assertion of the factual proposition that the appellant was present in the bowling alley at the time of the shootings, it would make no difference whether the "declarant" of the words intended to convey that factual proposition.

168 Md.App. at 35–36, 895 A.2d 339 (emphasis supplied).

We nonetheless held that the writing was not hearsay for the independent reason that it was non-assertive circumstantial evidence that Fields was at the crime scene.

*The appellant's name on the television screen* in the bowling alley was not an implied assertion of the factual proposition that the appellant was present at the bowling alley, although it *was circumstantial evidence* that could be probative of that fact. *Because the evidence was not an "assertion,"* under Rule 5–801(a), *it was not a "statement"*

under that subsection *and hence was not hearsay* under Rule 5–801(c). *It was admissible non-hearsay evidence. Id.* at 38, 895 A.2d 339 (emphasis supplied).

Judge Kenney was also a member of that panel and dissented from the majority decision. It was his opinion that the writing, under the authority of *Stoddard* and *Bernadyn*, was an implied assertion and was, therefore, hearsay.

> *Stoddard and Bernadyn lead me to conclude that the evidence* at issue *cannot be treated merely as circumstantial evidence* from which a fact finder might conclude that appellant was present at the bowling alley on the night of the incident, a fact that appellant denies.... [T]he name "Sat Dogg" on the television monitor, standing alone, has no purpose except to assert that appellant was obviously present and bowling on Lane 22 on the night in question. Its probative value is dependent on an unknown scribe's belief that one of the bowlers on lane 22 was "Sat Dogg," and the accuracy of that belief.

168 Md.App. at 49–50, 895 A.2d 339 (emphasis supplied).

On June 14, 2006, the Court of Appeals granted certiorari expressly to consider the specific question of "whether the Court of Special Appeals erred in holding that petitioner's nickname, 'Sat Dogg,' which was displayed on a television monitor above a bowling lane, was not hearsay." 390 Md. 513, 889 A.2d 1025 (2006).

The issue was thus cleanly joined. It would have been hard to drive a wedge between the circumstantial nature of the evidence in *Fields* and the circumstantial nature of the evidence in *Bernadyn*. There was no impediment to the deciding of the case on the issue for which certiorari had been granted. The decision in the case was filed on December 8, 2006, one year to the day after *Stoddard* and *Bernadyn* had been handed down. *Fields*, 395 Md. 758, 912 A.2d 637. After a routine recitation of the facts of the case and of its procedural history, the Court based its decision on a not particularly certworthy alternative ground.

*We need not determine whether the testimony* of Detective Canales *was inadmissible based on Bernadyn,* or even if the evidence is distinguishable, because even if it was hearsay and not admissible, any error was harmless beyond a reasonable doubt.

395 Md. at 763–64, 912 A.2d 637 (emphasis supplied).

In the wake of *Fields,* only an automaton could refrain from asking, "Why?" We would have to be blind not to conclude that something was in ferment behind the scenes; and that it was something other than a ringing endorsement of *Stoddard* and *Bernadyn.* Perhaps the energy that fueled the *Stoddard* and *Bernadyn* decisions a year ago has to some greater or lesser extent cooled. We are not suggesting for a moment that we would not follow the express and literal holdings of *Stoddard* and *Bernadyn.* We are simply pointing out that, in order to decide this case, we have to read the tea leaves. Reading those auguries, we are not persuaded to give *Stoddard* and *Bernadyn* a liberal or expansive interpretation.

### The Plague of Plain Error

In establishing his expertise on the subjects of drug use, detection, identification, and distribution, Corporal Aaron Michael of the Maryland State Police Drug Task Enforcement Division testified that he had made between 75 and 100 cocaine related arrests. On cross-examination it was brought out that Corporal Michael had never arrested the appellant. From that modest launching pad, the defense attempted a Herculean leap of logic in closing argument. It sought to persuade the jury that if Corporal Michael, with 75 to 100 notches in his belt in a sparsely populated rural area, had never arrested the appellant, the appellant, *ipso facto,* must have had a clean record. The State objected, and Judge Sause reminded defense counsel that Corporal Michael was not the only police officer in Queen Anne's County.

[DEFENSE COUNSEL]: [C]learly *had this gentleman been arrested* for distribution *before by the expert,* who had made 75 to 100 arrests, *he could have brought that up,*

talked about that, "You know, this is one of the guys that we know about" or something like that.

Clearly, *had they made buys from him* in the past, *they could say,* "Come to think of it, *we made buys from him—*"

[PROSECUTOR]: I'm going to object, Your Honor, we can't raise that.

THE COURT: Pardon me?

[PROSECUTOR]: He is saying we could have raised if we made buys from him or not in the past. We can't, we can't say that we know about him or not, we can't say that.

THE COURT: That's right. All right. That is correct. So, Mr. Anderson, as you know.

[DEFENSE COUNSEL]: I was going on what the corporal actually said with regard to him having never arrested Mr. Garner in the past.

THE COURT: Okay.

[DEFENSE COUNSEL]: I'll leave it at that.

THE COURT: *I mean, there are an awful lot of police officers in Queen Anne's County* and—

[DEFENSE COUNSEL]: *That's true.*

THE COURT: Go ahead.

(Emphasis supplied).

In an even more Herculean leap of logic, the appellant now contends that Judge Sause, in effect, told the jury that the appellant had a criminal record for narcotics violations. He claims that his case was hopelessly compromised.

> There is no possible construction of this remark which does not presuppose that Mr. Garner had a criminal history related to drug distribution. Judge Sause's extremely prejudicial comment, which was made in full hearing of the jury, requires reversal.

We are not disposed to give the matter any further thought. There was no objection, and the issue is not preserved for appellate review. Maryland Rule 4–323(c). In that the appellant, strangely, does not even ask us to overlook non-preservation, this contention may qualify as an instance

of non-preservation squared. By arguing the contention at length, however, the appellant would seem to invoke, at least implicitly, the plain error provision of Rule 8–131(a).

The frequency with which we are called upon to throw the life preserver of plain error to sinking (and eminently sinkable) contentions is almost a litigational scandal. It is as if appellate preservation had become an anachronistic embarrassment. We know, of course, that the possibility of plain error is out there, and on a rare and extraordinary occasion we might even be willing to go there. One must remember, however, that a consideration of plain error is like a trip to Angkor Wat or Easter Island. It is not a casual stroll down the block to the drugstore or the 7–11. The exaggerated cry of alarm in this case evokes no echo of Angkor Wat or Easter Island.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**